576 So.2d 776 (1991)
Elliot ZALEZNIK, and Joyce Zaleznik, His Wife, Appellants,
v.
GULF COAST ROOFING CO., INC., AA Stucco & Drywall, Inc., and Fenton Davis Painting, Inc., Appellees.
Nos. 90-00153, 90-00589.
District Court of Appeal of Florida, Second District.
February 27, 1991.
Rehearing Denied April 14, 1991.
*777 Karl Johnson and William G. Belcher, II, of Nuckolls & Johnson, P.A., Fort Myers, for appellants.
Thomas Franchino of Siesky & Lehman, P.A., Naples, for appellee Gulf Coast Roofing Co., Inc.
Daniel A. Gregory of Asbell, Hains, Doyle & Pickworth, P.A., Naples, for appellee AA Stucco & Drywall, Inc.
Mark A. Slack of Paulich, O'Hara, Slack & Menzes, P.A., Naples, for appellee Fenton Davis Painting, Inc.
ALTENBERND, Judge.
Elliot and Joyce Zaleznik appeal a final judgment which awards damages against them and imposes both equitable and mechanics' liens on their home in favor of three subcontractors: Gulf Coast Roofing Co., Inc., AA Stucco & Drywall, Inc., and Fenton Davis Painting, Inc. We affirm the award of damages on the theory of unjust enrichment. We reverse the equitable liens. We reverse Gulf Coast Roofing's mechanics' lien because it did not timely perfect its lien. Finally, we affirm AA Stucco's and Fenton Davis Painting's mechanics' liens, but limit the amount of those liens to the difference between the unpaid amount of the contract price at the time of abandonment and the amount paid by the Zalezniks to complete the home pursuant to the contract.

I. THE FACTS
On November 28, 1986, the Zalezniks entered into a contract with Monarch Construction Company for the construction of a house in Naples, Florida. After an early amendment to the contract, the contract price was $519,000. In March 1987, the Zalezniks and Monarch executed a change order for $30,620. As a result of this change order, the "contract price" of the home became $549,620 for purposes of the mechanics' lien law. § 713.01(3), Fla. Stat. (1985).
To finance the construction of the home, the Zalezniks obtained a commitment for a $519,000 construction loan from Sun Bank/Naples, N.A. Both the contract with Monarch and the loan agreement with Sun Bank provided for progress payments upon the completion of various phases of the home. The contract and the loan agreement, however, varied in the number of the progress payments, the amount of the payments, and the description of the work within each job phase.
The construction of the home progressed without any apparent complications for the first few months. As of April 9, 1987, the Zalezniks had paid Monarch a total of $299,910 for the construction of their home. This sum represented the first three progress payments and one-half of the cost of the change order.
In early April 1987, the president of Monarch informed the Zalezniks that his company was experiencing a shortfall in construction funds but assured them that the problem would be solved. During mid-April 1987 to May 1987, Monarch entered into subcontracts with these three subcontractors. Between April 22 and June 10, 1987, Gulf Coast Roofing performed approximately 80% of the roof work on the Zalezniks' home. There is no dispute that this work was worth $19,500, but Monarch never paid Gulf Coast for the work. Between May 6 and June 18, 1987, AA Stucco & Drywall completely performed its stucco subcontract, but Monarch did not pay the $38,295 owing for this work. There is no dispute that the stucco work was adequately performed and worth the contract price. Finally, between May 11 and July 7, 1987, Fenton Davis Painting performed most of the work required by its subcontract. Monarch made no payment to Fenton Davis, despite the fact that its work was satisfactory and worth $14,229.
The Zalezniks visited the jobsite and observed these subcontractors performing their work. Although the Zalezniks were aware of Monarch's financial problems and had decided to temporarily stop any additional progress payments, they did not inform the subcontractors of these problems. *778 Instead, the Zalezniks allowed the subcontractors to continue working on their home. The Zalezniks do not dispute that the subcontractors' work substantially increased the value of their home and that they did not pay anyone for the work.
In mid-July 1987, after these subcontractors had performed their work in whole or in part, the Zalezniks concluded that Monarch would not fulfill its contract. As a result, they obtained several bids from other contractors to finish the home. Lundstrom-McDonald Development, Inc., was the lowest bidder.
During late July 1987, Monarch ceased work on the job. The evidence establishes that certain work, which was a condition of the fourth progress payment under either the construction contract or the loan agreement, was never completed while Monarch was performing its contract. We note that, while additional voluntary payments may have allowed construction to continue under the leadership of Monarch, there was no determination by the trial court that the Zalezniks were legally obligated to make any additional payments to Monarch.
On August 7, 1987, the Zalezniks' attorney requested Monarch to legally abandon the job so that Lundstrom could finish the home. In mid-August, Monarch provided the Zalezniks with a written notice of abandonment. The Zalezniks then formally entered into a contract with Lundstrom. On August 14, 1987, the day the Zalezniks received Monarch's notice of abandonment, they recorded an owner's affidavit of intention to recommence construction and a notice of recommencement pursuant to section 713.07(4), Florida Statutes (1985). Thereafter, the three subcontractors timely recorded a claim of lien.
When the Zalezniks entered into the contract with Lundstrom, $249,710 of the Monarch contract price remained unspent. The Lundstrom contract specified $271,000 to finish the home. Lundstrom finished construction of the home. At trial, however, the Zalezniks were able to produce cancelled checks to Lundstrom that totalled only $232,896. As a result, the trial court found that $16,814 of the Monarch contract price remained unpaid.[1]
The Zalezniks refused to pay these subcontractors, maintaining that they had no obligation to pay them under section 713.06, Florida Statutes (1985). This litigation ensued. The subcontractors sought damages under theories of unjust enrichment and quantum meruit. They also sought equitable and mechanics' liens.
The trial court carefully prepared a final judgment containing extensive findings of fact and conclusions of law that has greatly assisted this court. The trial court awarded each of the subcontractors damages based upon their alleged theories. The trial court also imposed equitable and mechanics' liens on the Zalezniks' home. Because the court found that the Zalezniks had unreasonably delayed the recommencement of the job, it imposed the mechanics' liens for the full amount of the subcontractors' claims, plus interest, costs, and attorneys' fees.

II. UNJUST ENRICHMENT
We affirm the damages award under the theory of unjust enrichment. The Zalezniks received over $70,000 in construction work performed during the fourth phase, for which they paid no one. There is no question that the work performed by the subcontractors added substantial value to the home. Since the subcontractors' work was finished before Lundstrom began its work, it was not a portion of the Lundstrom contract. If this work had not been *779 performed by these subcontractors, it is clear that the Zalezniks would have had to pay Lundstrom more money for comparable work.
Although there is no evidence or finding by the trial court that the Zalezniks intended to mislead or defraud these subcontractors, the Zalezniks received a substantial benefit from the subcontractors under circumstances which make it inequitable for them to retain the benefit without paying for it. Craig W. Sharp, P.A. v. Adalia Bayfront Condominium, Ltd., 547 So.2d 674 (Fla. 2d DCA 1989); Henry M. Butler, Inc. v. Trizec Properties, Inc., 524 So.2d 710 (Fla. 2d DCA 1988). These circumstances include, quite significantly, the fact that the Zalezniks knew the work was being performed while the general contractor was experiencing financial difficulties and after they had decided to temporarily stop future payments. Had this information been disclosed to the subcontractors, it is obvious that they would not have performed this work without additional security. We distinguish this case from Yates v. Bernard's Carpet and Draperies, Inc., 481 So.2d 515 (Fla. 4th DCA 1985), because the owner in that case paid an interior decorator for carpet and the decorator simply did not pay the carpet installer. The owner did not receive a benefit free of charge.

III. THE EQUITABLE LIENS
Under the theory of unjust enrichment, we are effectively recognizing an implied contract which permits the subcontractors to recover the fair value of their goods and services as a damages remedy. It is, however, more difficult to imply contractual terms allowing the subcontractors a lien against the owner's home as an equitable remedy.
When a subcontractor has failed to perfect a statutory lien, Florida's courts have hesitated to provide an equitable lien. Crane Co. v. Fine, 221 So.2d 145 (Fla. 1969); Phillips Petroleum v. Schun Co., 222 So.2d 491 (Fla. 4th DCA 1969); J.G. Plumbing Serv. Inc. v. Coastal Mortgage Co., 329 So.2d 393 (Fla. 2d DCA 1976). In order to establish an equitable lien on real property, this court has required "circumstances such as fraud or misrepresentation of essential facts upon which the lender or contractor relied in good faith, or there must be an agreement by the owner of the property to have certain property stand as security for a specific obligation." Jennings v. Connecticut Gen. Life Ins. Co., 177 So.2d 66, 68 (Fla. 2d DCA 1965), cert. discharged, 185 So.2d 169 (Fla. 1966); see also Largo Hosp. Owners v. International Glass and Mfg. Co., 410 So.2d 518 (Fla. 2d DCA 1982). The trial court did not conclude that the Zalezniks were guilty of any such fraud, misrepresentation, or deception. The record in this case contains no evidence that would support such a finding. This is not a case involving privity of contract. At worst, the evidence suggests that the Zalezniks did not discuss the general contractor's financial problems with these subcontractors at a point when the Zalezniks were uncertain about the general contractor's ability to complete the job. Thus, the subcontractors are not entitled to enforce their judgment by an equitable lien against this home. We reverse this aspect of the final judgment.

IV. GULF COAST ROOFING'S MECHANICS' LIEN
The Zalezniks argue that Gulf Coast Roofing did not perfect its mechanics' lien under chapter 713 because it failed to timely serve them with a notice to owner. § 713.06(2)(a), Fla. Stat. (1985). We agree. Section 713.06(2)(a) requires a lienor such as Gulf Coast Roofing to serve a notice on the owners not later than 45 days from the day the lienor commences its services. The section further states that the lienor's "failure to serve the notice, or to timely serve it, shall be a complete defense to enforcement of a lien by any person." § 713.06(2)(a), Fla. Stat. (1985). See Stratton of Fla., Inc. v. Cerasoli, 426 So.2d 59 *780 (Fla. 2d DCA), review denied, 434 So.2d 886 (Fla. 1983).
In this case, the Zalezniks recorded a notice of commencement naming Monarch as the contractor and requesting that a copy of any lienor's notice be mailed to Sun Bank.[2] Nothing in the record indicates that the Zalezniks appointed an agent for purposes of notice. Gulf Coast Roofing commenced its work on April 22, 1987. It served a notice on Monarch 13 days later and sent a copy of its notice to Sun Bank. Gulf Coast, however, did not serve this notice on the Zalezniks. It served a notice on the Zalezniks 57 days after it commenced its work. This second notice was not timely served, and the record does not establish that the Zalezniks otherwise received notice within the 45-day period that Gulf Coast had to inform the Zalezniks that it may look to them for payment. See New Image Carpets, Inc. v. Sandery Constr., Inc., 541 So.2d 1235 (Fla. 2d DCA 1989). Accordingly, we reverse Gulf Coast's mechanics' lien and its corresponding award of attorney's fees.
Gulf Coast Roofing relies heavily on the trial court's finding that it had "substantially complied" with the notice provisions and that the Zalezniks had not been prejudiced by the technical error in notice. This finding appears to be based on the 1987 legislative enactment of section 713.06(2)(d), which permits the imposition of a mechanics' lien if the lienor has "substantially complied" with the statute and the owner has not been adversely affected by any omission or error. Ch. 87-74, § 3, Laws of Fla. This legislative enactment, however, did not become effective until October 1, 1987. Ch. 87-74, § 10, Laws of Fla. The Zalezniks are entitled to rely on the 1985 version of the mechanics' law because all of the relevant acts occurred prior to this 1987 change. Royal v. Clemons, 394 So.2d 155 (Fla. 4th DCA 1981).

V. THE OTHER SUBCONTRACTORS' MECHANICS' LIENS
The Zalezniks do not contest the timeliness of the notices to owner served by AA Stucco & Drywall and Fenton Davis Painting. The trial court correctly determined that these two subcontractors perfected their lien rights. Thus, the trial court properly imposed these mechanics' liens on the Zalezniks' home.
Although the Zalezniks had only $16,814 remaining on their contract price, the trial court imposed mechanics' liens for the entire amount of the subcontractors' unpaid work on the basis that the Zalezniks had unreasonably delayed in recommencing the construction of their home. There is no substantial competent evidence to support this determination, thus we reduce the amount of the mechanics' liens to the $16,814 amount remaining on the Monarch contract price.
As a general rule, when an owner finishes an abandoned job through a second general contractor and the owner complies with the mechanics' lien statutes, the owner is obligated to pay the lienors under the original contract only their pro rata share of a fund consisting of the amount due under the contract when it was abandoned and any amount unspent out of the original contract price when the job is finished. §§ 713.06(3)(e), .07(4), Fla. Stat. (1985); Alton Towers, Inc. v. Coplan Pipe & Supply Co., 262 So.2d 671 (Fla. 1972); McCurry v. Eppolito, 506 So.2d 1110 (Fla. 1st DCA 1987). The trial court did not find that the Zalezniks owed any amount to Monarch when the job was abandoned. Thus, absent special circumstances, the liens should be limited to the $16,814 saved by finishing the home under the Lundstrom contract.
The subcontractors argue that the general rule does not apply in this case because the Zalezniks unreasonably delayed in recommencing the job. The subcontractors rely on Florida Steel Corp. v. Adaptable Developments, 503 So.2d 1232 (Fla. 1986). Florida Steel involved a claim of a materialman against an owner who did not comply *781 with the technical requirements of section 713.07(4) before recommencing the job. Whether that technical violation would have been sufficient to permit the materialman to obtain a lien is unclear. The supreme court refused to apply Alton Towers in that case, explaining that the project had been dormant for eight months and the costs of completion would be higher as a result of that unreasonable delay.
In this case, the Zalezniks complied with all of the requirements of the mechanics' lien law. They quickly obtained a second contractor and did not leave their jobsite dormant for any significant length of time. They recommenced the construction of their home on the day that Monarch formally abandoned the job. The trial court did not find that the Zalezniks were manipulating the timing on this job. There is no evidence in the record that the cost of completion had increased due to an unreasonable delay. If we were to uphold a finding of unreasonable delay in this case because the Zalezniks did not somehow force Monarch off the job in April, we would require owners to compel struggling general contractors to rapidly abandon jobs that the contractors may be able to finish. We see no reason to encourage that practice. Accordingly, we uphold these two mechanics' liens, but only to the extent of the limited fund. We also affirm the corresponding award of attorney's fees to these subcontractors.
Affirmed in part, reversed in part, and remanded.
THREADGILL, A.C.J., and PARKER, J., concur.
NOTES
[1] Copies of two additional checks from the Zalezniks to Lundstrom were marked but not admitted into evidence. These checks would have established a total payment to Lundstrom of approximately $271,000. The trial court refused to admit the checks on the grounds of authenticity and because the checks were not revealed at the pretrial conference. This evidentiary ruling was within the trial court's discretion. See Binger v. King Pest Control, 401 So.2d 1310 (Fla. 1981); Lockwood v. Baptist Regional Health Servs. Inc., 541 So.2d 731 (Fla. 1st DCA 1989); Crawford v. Shivashankar, 474 So.2d 873 (Fla. 1st DCA 1985). The Zalezniks did not attempt to authenticate the copies of these checks through a different witness.
[2] The mechanics' lien statutes provide that the owner may designate "a person in addition to himself to receive a copy of such lienor's notice." § 713.06(2)(b), Fla. Stat. (1985).