959 So.2d 322 (2007)
AMERICAN SAFETY INSURANCE SERVICE, INC., et al., Appellant,
v.
Donald GRIGGS, John Amodia, Lou Amodia, et al., Appellee.
No. 5D05-2883.
District Court of Appeal of Florida, Fifth District.
May 18, 2007.
Rehearing Denied July 6, 2007.
*324 John A. Christy and Debra A. Wilson, of Schreeder, Wheeler & Flint, LLP, Atlanta, GA, and J. Lester Kaney of Cobb & Cole, P.A., Daytona Beach, for Appellant.
David A. Vukelja of David A. Vukelja, P.A., Ormond Beach, for Appellee.
THOMPSON, J.
American Safety Insurance Services, Inc. ("ASIS"), American Safety Insurance Group, Ltd. ("ASIG"), American Safety Reinsurance, Ltd. ("ASRE"), and Ponce Lighthouse Properties, Inc. ("Lighthouse") (collectively, "American Safety") appeal the trial court's order that ruled American Safety had been unjustly enriched by the plaintiffs. The plaintiffs are seven Connecticut residents  [Donald Griggs, John Amodia, Lou Amodia, Michael D'Addabbo ("D'Addabbo"), Terry B. Fletcher, Louis T. Burnett, and Edward R. Mauro]  (collectively, "Connecticut Seven") who invested money in a project to develop property in Ponce Inlet. American Safety raises several points on appeal, but two are dispositive. Because the Connecticut Seven's claim for unjust enrichment failed as a matter of law and the damages award was unsupported by substantial, competent evidence, we reverse.

FACTS
A. Background.
In the late 1980s, each of the Connecticut Seven invested $300,000 into a company owned and run by H. Mac McMurry. McMurry was a banker for decades, served as a bank president, and was intimately familiar with commercial development loans. In 1986, the Connecticut Seven provided $300,000 letters of credit as collateral to a limited partnership formed to acquire and develop approximately 115 acres of land in Ponce Inlet. McMurry, another individual, and Ponce Marina, Inc. ("PMI") were general partners.[1] The letters were supposed to serve as collateral, not funding.
McMurry testified that the first mortgage from Carrie Bank was for approximately $4.5 million. The sale closed in early 1985, and McMurry estimated that zoning and permitting would require $250,000 and one year. His projection was off by about nine years and $1.8 million. Because McMurry could not get the loan extended, he convinced the Connecticut Seven to allow him to draw upon the $300,000 letters of credit to fund the project. Their funds were exhausted by 1989, though no construction occurred. PMI delivered to each plaintiff a $300,000 promissory note in September 1990, secured by half of PMI's outstanding shares.
The record shows McMurry and the Connecticut Seven expected the first mortgage to be paid before the promissory notes. A November 1994 letter from McMurry to J. Dana Fogle, the Connecticut Seven's counsel, stated the promissory notes would be paid "following the payment of the first mortgage." The Connecticut Seven released their February 1994 lis pendens on the property, but recorded the November 1994 agreement. In January 1995, the Connecticut Seven signed a subordination agreement, agreeing the Connecticut Agreement was subordinate to the first mortgage.
PMI was financially troubled. It faced foreclosure from 1989 through 1999, when American Safety foreclosed. In this time, McMurry sent various last-minute requests for more money to the Connecticut Seven. For example, in November 1993, McMurry requested funds due within one *325 week to extend PMI's permits. In March 1997, McMurry contacted the Connecticut Seven because he needed within four days approximately $500,000 for improvements and the 1994 tax bill.
The Connecticut Seven did not contribute additional funds in 1997, and Citibank, which had acquired the mortgage, filed an action for foreclosure in May 1997. The principal owed was approximately $8.85 million. In November 1997, MD Marina Ltd. ("MD Marina") acquired the debt and documents from Citibank, was substituted as a plaintiff, and proceeded with the foreclosure. After more than ten years of McMurry's stewardship, no construction had occurred on the property.
B. American Safety gets involved.
American Safety and Lloyd Fox, the president of the three American Safety defendants, were not yet involved. In November 1997, Steve Sirang of the Cobb Capital Corporation wrote to his friend, Fox, about the project and recommended that American Safety provide financing. We highlight two critical documents preceding the May 1998 agreements between American Safety, PMI, and the Connecticut Seven.[2]
First, Synergy (ASIS) provided a loan commitment letter to PMI on 16 April 1998, which provided that, as an express condition precedent to the loan commitment, Synergy must "purchase all existing promissory notes made by [PMI], which are secured by the Property. . . ." As collateral for the loan, PMI was required to provide a deed and security agreement creating a first priority lien and security interest on the property and improvements.
Second, we note with interest Fogle's letter to McMurry dated 21 May 1998  one week before the Connecticut Seven and PMI executed their profit participation agreement. Fogle's summary of the terms show that he knew all of them, contrary to McMurry's "ambush" testimony at trial:
1. As consideration . . ., the Connecticut 7 will execute a full assignment to Peggy McMurry of each of their 71 shares of stock, and of the promissory note secured by the pledge of said stock.

2. . . . [PMI] . . . would acknowledge that [PMI] owes the Connecticut 7 the total sum of . . . [$3,584,000], as to this transaction only. . . .
Mac, . . . the final agreement would need to be signed by all of the affected parties. . . . I've taken the liberty of faxing it to you and [the Connecticut Seven] simultaneously. . . .
We are all rooting for you, and realize that we sink or swim, together.
(Emphasis added).
The 29 May 1998 agreement between the Connecticut Seven and PMI.
The Connecticut Seven and PMI entered into a profit sharing agreement on 29 May 1998. The Connecticut Seven claims on appeal that it contained provisions that conferred benefits directly to American Safety. This agreement provided:
WHEREAS, [PMI] borrowed money secured by the Project pursuant to certain loan documents . . .; and
WHEREAS, a successor in interest to the original lender . . . sued to foreclose on the Project . . . [;]
WHEREAS, [PMI] desires that [ASRE] ("Lender") acquire the First Mortgage Loan and . . . Documents, and to provide *326 further development and pre-construction financing to [PMI], and to settle the Litigation.
WHEREAS, Lender is willing to acquire the First Mortgage Loan and . . . Documents, and to make the further advances to [PMI], and to cause the Litigation to be resolved only if Parties agree to enter into this Agreement.
WHEREAS, [PMI] has previously entered into agreements for repayment of investments by CONNECTICUT-7 . . ., which agreements are evidenced by certain Promissory Notes secured by 500 shares of stock owner.
WHEREAS, the parties hereto recognize that [PMI] has entered into a Loan Agreement with Lender necessitating a novation of all prior agreements between the parties, and the release of 500 shares of stock of [PMI] so that such shares may become available to be pledged to Lender.
WHEREAS, the CONNECTICUT-7 have agreed to a term of payment payable on distribution of profits to [PMI] and calculated based on unit sales.
WHEREAS, [PMI] has entered into a certain Profit Participation Agreement with Lender, pursuant to which [PMI] is permitted to receive profit distributions from Project in an amount equal to one hundred percent (100%) of the profits up to the first $6,477,250.00 and thirty three and one third percent (33%) of the profits distributions for every dollar of profit thereafter.
NOW THEREFORE, . . . the parties hereto agree as follows:
1. PARTICIPATION.

1.1 . . . CONNECTICUT-7 will execute a full assignment to PEGGY A MCMURRAY [sic] of each of their five hundred (500) shares of [PMI] stock . . . and of the Promissory Notes . . ., and . . . remove any liens from the record against the Project. . . .
1.2 [PMI] acknowledges that the amount due by [PMI] to CONNECTICUT-7 under the Promissory Notes is $3,584,000.00 including principal and accrued interest to date (and not further interest thereunder) (the "Debt")[.]
1.3 [PMI] shall repay the Debt to the CONNECTICUT-7. . . .
1.4 . . . CONNECTICUT-7 shall be entitled to receive from [PMI] in satisfaction of the Debt . . . $4,200.00 for each . . . condominium unit and each boat slip when sold and closed . . . payable as follows:
a) CONNECTICUT-7 shall receive . . . ($1,400.00) at the time of the sale and closing of each residential unit and each boat slip.
b) At the completion of each Project phase . . . and after the full payment of principal and interest for all lenders holding any mortgage interest in the Project from the profit distributions to [PMI] as described above, [PMI] shall pay to CONNECTICUT-7 . . . $2,800.00 for each . . . condominium unit and boat slip previously sold. . . .
1.5 CONNECTICUT-7 expressly acknowledges and agrees that any and all payments due under this Agreement shall not be secured by the Project in any manner whatsoever and that this Agreement shall not be recorded in the Public Records of Volusia County, Florida.

(Emphasis added).
The plaintiffs delivered the promissory notes and stock to PMI, released the November 1994 agreement concerning the notes, and did not record the profit participation agreement.
*327 The 29 May 1998 loan agreement between PMI and American Safety.
On 29 May 1998, ASRE purchased the loan documents and indebtedness held by MD Marina and agreed to advance additional sums to PMI. Among the loan agreement's terms, PMI covenanted to "[c]onvert at least 70 of the 117 potential . . . purchasers on the reservation list to hard contracts . . . [by 1 November 1998]."[3]
The 29 May 1998 stipulation for settlement.
In connection with the loan agreement, on 29 May 1998, American Safety, PMI, and McMurry entered into and filed with the court a stipulation for settlement, which a Volusia County Circuit Court judge found to be "entered into knowingly and voluntarily, [and] valid and binding in all respects." As a result, the action was abated until either 31 March 1999 or a default. The stipulation traced the first mortgage, noted ASRE was substituted as plaintiff with all parties' consent, and acknowledged ASRE would not have purchased the loan or advanced additional funds but for the stipulation permitting immediate foreclosure upon default. ASRE became the holder of the Citibank mortgage and mortgage modification agreements. All counterclaims and defenses of PMI, McMurry, and MDI were withdrawn and dismissed with prejudice.
In the stipulation, McMurry agreed the First Mortgage constituted a valid first lien on the property and was in default. With the additional advance by ASRE, PMI owed $11,137,855.89. PMI was required to pay at least $6.4 million by 31 March 1999. If the defendants defaulted, they consented to an ex parte judgment that was attached to the stipulation. The following was underlined, capitalized, and bolded:
[PMI], MD Marina, Inc. and [McMurry] do hereby knowingly, voluntarily and with the advice of counsel: waive notice and service of the filing of the affidavit for entry of judgment and presentation and entry of the foreclosure judgment and consent to the ex parte presentation, filing and request for entry of the foreclosure judgment; and agree to take no action to prevent the entry of the foreclosure judgment.
McMurry's trial testimony regarding the first agreement.
McMurry claimed that American Safety's demand for the Connecticut Seven collateral arose one day before the closing. He claimed he saw none of the documents until minutes before he signed them, understood none of the documents, and was forced to sign them. This testimony was delivered over American Safety's ongoing relevance objection  McMurry's story had much to do with McMurry's feeling that American Safety was unfair, but nothing to do with whether American Safety was unjustly enriched. American Safety also noted that McMurry's challenges of the agreements and foreclosure had already failed in previous trials and appeals.[4] McMurry acknowledged that the agreements explicitly provided that PMI remained responsible for its debts to the Connecticut Seven, but he felt PMI should not have to pay. McMurry conceded that he and his wife had drawn $120,000 salaries, *328 but that he did not pay the Connecticut Seven.
The 2 October 1998 amended profit participation agreement.
McMurry borrowed additional money from ASRE. The parties amended the agreement so that McMurry would secure a guaranteed sum of money in exchange for the remaining third of the interest in PMI's profits above a certain amount. McMurry signed these documents as well. The "First Amended and Restated Profit Participation Agreement" was executed on 2 October 1998 between PMI and ASRE and provided:
WHEREAS, pursuant to the request of [PMI], Lender acquired the First Mortgage . . ., Lender substituted itself as the opposing party in the Litigation, and [PMI], . . . McMurry and Peggy A. McMurry, ("Guarantors") and Lender executed and entered into (i) the [29 May 1998] Stipulation for Settlement ("Stipulation") . . .; and
* * *
WHEREAS, [PMI] desires to borrow an additional $625,000.00 from Lender (the "New PMI Loan"); and
WHEREAS, pursuant to the Loan Agreement . . . (the "New Loan Agreement") among [PMI], Lender and Guarantors, Lender agreed to advance an additional $500,000.00 to [PMI] upon satisfaction of certain conditions set forth in the New Loan Agreement (the "Phase I Loan"); and
The agreement also stated:
Nothing contained . . . in any of the [loan] documents . . ., including the provisions for the payment of Net Proceeds, shall be deemed or construed to create a liability company, tenancy-in-common, joint tenancy, joint venture or co-ownership by or between Lender and Owner. Lender shall not in any way be responsible for the debts, losses or obligations of Owner. . . .
(Emphasis added).
Furthermore, PMI indemnified and held American Safety harmless for:
any and all liabilities, losses, . . . cost, expenses and damages, . . . which Lender may . . . incur as a result hereof and from any and all claims . . . which may be instituted against Lender by reason of any alleged obligation or undertaking on Lender's part to perform or discharge any of the terms, covenants or agreements contained in any lease, agreement or contract relating to the Premises to which Lender is not a direct and express party.
Foreclosure
In January 1999, American Safety noted that PMI and McMurry were in default for failure to convert into hard contracts at least 70 of the 117 purchasers on the reservations list. An amended judgment of foreclosure was entered on 19 February 1999. As part of the settlement, ASRE stated it would accept $9,950,000 from the proceeds of a Bank Atlantic loan committed to PMI if it was received before 31 March 1999. However, McMurry was unable to procure the necessary financing. Ultimately, American Safety entered an ex parte foreclosure and bought the property.
C. The Connecticut Seven's quasi-contract claim.[5]
The August 2003 complaint highlighted the letters of credit provided to PMI that were exhausted by 1989 and the subsequent *329 1994 agreement by which PMI promised to pay the Connecticut Seven. The plaintiffs argued four grounds for relief and prevailed on their third count, which alleged "breach of quasi-contract." After cursorily realleging the complaints' first 44 paragraphs, the Connecticut Seven alleged:
53. Defendants, as the current owners and developers of the Harbor Village Golf and Yacht Club, benefited from the original investment in the development by the Plaintiffs. The funds loaned by the Plaintiffs were used, in part, to make the essential initial improvements on the property, as well as to pay for permits. . . . The financial rewards Defendants now realize . . . would not have been possible but for the money loaned by the Plaintiffs.
54. . . . Their continued acceptance of these benefits without paying Plaintiffs for the value of the benefits is both inequitable and unfair.
55. On October 2, 1998, Defendants agreed that sales proceeds from the Marina Dunes development would be used to pay Plaintiffs as set forth in the Profit Participation Agreement of May 29, 1998 between PMI and the Plaintiffs.
56. Defendants breached this quasi contract by unconscionably retaining all sales proceeds from the development and by refusing to use any of the sales proceeds received from the sale of condominium units or boat slips toward the satisfaction of the debt due and owing Plaintiffs. Instead, Defendants are being unjustly enriched at the expense of the Plaintiffs by retaining excess profits received from the development for their own benefit and pleasure.
57. As a direct and proximate result od [sic] Defendants breach of quasi contract, Plaintiffs have suffered damages in the amount due and owing to them from Defendants. WHEREFORE, the Plaintiffs . . . demand judgment against Defendants . . . for compensatory damages . . . of $3,534,000, plus prejudgment interest, costs, and such other relief as this Court deems just and proper. . . .
(Emphasis added).
While opposing summary judgment, the Connecticut Seven maintained that the "benefit conferred" was their investment: "[T]he Connecticut 7 invested substantial amounts of money in the development and . . . American Safety continually benefits from this investment." Counsel's opening argument crystallized its claim: "Now the nature of the claim is real simple. My clients want their money back." The quasi-contract claim turned on "the evidence . . . that . . . but for [the plaintiffs'] financing this project from March of '88 through December of '89 there would be no project[,] . . . no permits[, and] . . . no zoning." American Safety knowingly received these benefits because they received the permits and zoning after the foreclosure. Counsel never stated the value of these benefits; rather, the plaintiffs wanted the $3,584,000 from their agreement with PMI. It was only during their argument against directed verdict and in closing that, they responded to the court's question that the benefit conferred might be the plaintiffs' security that was relinquished at American Safety's request.
D. The trial court's final judgment.
The court directed a verdict for the defendants on all claims except quasi-contract. The court accepted McMurry's version of the May 1998 agreement, underlining the factual finding it considered most important to the quasi-contract claim:
On May 28, 1998, one day before the loan closing, defendants' general counsel delivered to [McMurry] new conditions *330 to closing not included in the loan commitment letter. Important to the instant action is that the 1994 agreement in favor of plaintiffs had to be removed from the public record, all shares of PMI (including shares held by plaintiffs as security for their loans) and promissory notes held by plaintiffs had to be delivered to defendants.

(Emphasis in original).
According to the court, McMurry had no financing alternatives because, if he refused American Safety's demands, everything he and the Connecticut Seven had invested in the project would be lost. The court found that the Connecticut Seven directly conferred benefits on American Safety because they: executed the profit participation agreement with PMI and agreed not to record it; executed a release of the 1994 agreement with PMI; "surrendered their promissory notes to defendants"; returned the PMI stock certificates; and agreed to subordinate their claims against the project to the first mortgage. According to the court, "[t]his conferred a benefit upon defendants in that defendants achieved a first mortgage position free of any priority claims for repayment of the plaintiffs' loans and could take possession of the stock in PMI as additional security for the mortgage."
The court also emphasized that, instead of dismissing the foreclosure action, ASRE substituted itself as plaintiff and abated the action. Furthermore, American Safety required an amended profit participation agreement before lending McMurry an additional $625,000. The court discussed at length the foreclosure proceedings against PMI and repeated its finding that American Safety "demanded the concessions from plaintiffs (indirectly through [McMurry]) on the very eve of closing of the refinancing loan. . . ." It concluded that the defendants must pay fair value for the benefit conferred.
The court rejected American Safety's point that the Connecticut Seven had never described the benefit conferred for the quasi-contract claim; the Connecticut Seven's realleging of underlying facts sufficed, notwithstanding their explicit allegation in the complaint and at trial that the benefit conferred was their investment in the '80s. The court found the value of the benefit conferred was the amount of the loans in May 1998. Therefore, it required American Safety to pay the value of the original loans and prejudgment interest from May 1998, totaling $3,426,703.50.

DISCUSSION
American Safety argues that the Connecticut Seven did not establish the elements of quasi-contract. The Connecticut Seven respond that American Safety was unjustly enriched by refusing to pay them for the notes and stock they relinquished to PMI because American Safety wished it. American Safety is correct.
First, we note that the Connecticut Seven's argument on appeal was not presented below. From their complaint through their case in chief, plaintiffs explicitly argued that the benefit conferred was their initial investment, which occurred almost ten years before American Safety entered the picture. Their argument on appeal was articulated once and only in response to the court's question during closing argument. Accordingly, the trial court erred by holding that this theory had been presented merely because one sentence in the count alleging "breach of quasi-contract" reasserted previous allegations. Moreover, the unpled theory could not be considered to have been tried by implied consent because the evidence presented at trial concerning the 1998 agreements was relevant to the other counts that were *331 properly being tried. Nichols v. Michael D. Eicholtz, Ent., 750 So.2d 719, 720 (Fla. 5th DCA 2000).
Turning to the merits, we conclude that the Connecticut Seven cannot establish a claim for quasi-contract.
A contract implied in law is a legal fiction, an obligation created by the law without regard to the parties' expression of assent by their words or conduct. The fiction was adopted to provide a remedy where one party was unjustly enriched, where that party received a benefit under circumstances that made it unjust to retain it without giving compensation.
The elements of a cause of action for a quasi contract are that: (1) the plaintiff has conferred a benefit on the defendant; (2) the defendant has knowledge of the benefit; (3) the defendant has accepted or retained the benefit conferred[;] and (4) the circumstances are such that it would be inequitable for the defendant to retain the benefit without paying fair value for it.
Commerce P'ship 8098 Ltd. P'ship v. Equity Contr. Co., 695 So.2d 383, 386 (Fla. 4th DCA 1997) (citations omitted); see also Della Ratta v. Della Ratta, 927 So.2d 1055, 1059 (Fla. 4th DCA 2006).
A plaintiff may recover under quasi-contract where there is no express or implied-in-fact contract, but the defendant received something of value or benefited from the service supplied. Commerce P'ship, 695 So.2d at 387. However, damages under quasi-contract "cannot be awarded upon the singular determination that the requesting party is deserving." May v. Sessums & Mason, P.A., 700 So.2d 22, 28 (Fla. 2d DCA 1997) (quoting Corn v. Greco, 694 So.2d 833, 834 (Fla. 2d DCA 1997)). Parties may not dodge these constraints by appealing to the court's powers in equity; an action for unjust enrichment is an action at law, not in equity. See Della Ratta, 927 So.2d at 1060 & n. 2; Commerce P'ship, 695 So.2d at 390 (noting that, "[a]lthough some Florida courts have described quasi contracts as being `equitable in nature,' . . . the term has been used in the sense of `fairness,' . . . not as a reference to the equity side of the court.").
The plaintiffs must show they directly conferred a benefit on the defendants. See Peoples Nat'l Bank of Commerce v. First Union Nat'l Bank of Fla., 667 So.2d 876, 879 (Fla. 3d DCA 1996). The plaintiffs could make no such showing for their initial investments, which occurred long before American Safety entered into an agreement with PMI. Their remaining argument rests on whether their agreement with PMI establishes the requisite direct benefit to American Safety.
Here, the plaintiffs bargained with PMI for the terms under which they would relinquish the promissory notes and stock. In exchange for relinquishing the notes, which PMI had been unable to pay since their issuance in 1990, the Connecticut Seven entered into a profit participation agreement providing for repayment plus interest. More important, the Connecticut Seven helped PMI obtain alternative financing, which kept alive their hope for a return on their investment.[6]
Nor did the Connecticut Seven prove that American Safety had not paid for the benefits allegedly conferred by the Connecticut Seven, which is an essential element of a quasi-contract claim. See Commerce P'ship, 695 So.2d at 390. When a defendant has given adequate consideration *332 to someone for the benefit conferred, a claim of unjust enrichment fails. See Behm v. Cape Lumber Co., 834 So.2d 285, 287 (Fla. 2d DCA 2002); Commerce P'ship, 695 So.2d at 390; cf. Zaleznik v. Gulf Coast Roofing Co., 576 So.2d 776, 778-79 (Fla. 2d DCA 1991). American Safety entered into agreements with PMI in which the parties received exactly what they bargained for. N.G.L. Travel Assocs. v. Celebrity Cruises, Inc., 764 So.2d 672, 674-75 (Fla. 3d DCA 2000). The issue is not whether American Safety paid specifically for the security that the Connecticut Seven relinquished to PMI. American Safety agreed to purchase the loan and advance additional funds in exchange for a first in priority mortgage, secured by all outstanding shares of PMI. See Blum v. Dawkins, Inc., 683 So.2d 163, 164 (Fla. 5th DCA 1996). American Safety was permitted to bargain for the terms under which it would provide the loan and additional funds. Both American Safety and the Connecticut Seven entered into agreements with PMI that clearly delineated their responsibilities and the benefits bargained for in each agreement. The Connecticut Seven cannot show they conferred a direct benefit that American Safety had not already "paid for" by contracting with PMI to assume the mortgage and advance additional funds while stepping into the previous mortgagee's shoes.
American Safety next argues that the damages award was unsupported by substantial, competent evidence. The Connecticut Seven responds that, under Cohen v. Kravit Estate Buyers, Inc., 843 So.2d 989, 992 (Fla. 4th DCA 2003), the benefit conferred need not be a concrete property interest. However, Cohen does not stand for the proposition that the plaintiff need not establish the value of the benefit allegedly conferred. There, the interest was "the lost expectation payment for agreed-upon services," which presented a question of fact precluding summary judgment. Id. at 992.
Here, even if plaintiffs' contractual agreement with PMI could be construed to confer a direct benefit on American Safety, plaintiffs only presented evidence of the money they hoped to receive under their profit participation agreement with PMI. They presented no evidence of the value of the benefit conferred upon American Safety in the form of the PMI stock or the promissory notes that plaintiffs relinquished. Cf. Levine v. Fieni McFarlane, Inc., 690 So.2d 712, 714 (Fla. 4th DCA 1997) (noting plaintiff presented testimony supporting damages based on enhancement to property). "[T]he damages in this case are highly speculative. Damages cannot be based on speculation, conjecture or guesswork." Swindell v. Crowson, 712 So.2d 1162, 1164 (Fla. 2d DCA 1998) (citation omitted). Trial courts may not allow greater awards for damages than those that are reasonably supported by the evidence. Montage Group, Ltd., and Digital Editing Servs., Inc. v. Athle-Tech Computer Systems, Inc., 889 So.2d 180, 197 (Fla. 2d DCA 2004) (holding court erred by failing to order appropriate remittitur for unjust enrichment award). Unjust enrichment awards are not punitive, and allowing plaintiffs a recovery worth more than the benefit conferred would result in an unwarranted windfall. Id.
Here, despite the plaintiffs' investment, PMI's project had resulted in litigation in Florida and Connecticut, defaults on loans secured by the project from 1989, periodic foreclosure proceedings from 1992 to 1999, and no vertical construction from 1986 until PMI's interest in the property was foreclosed. The Connecticut Seven presented no evidence of PMI's stock (a private corporation whose asset teetered on the brink of foreclosure) or the value of the promissory *333 notes that PMI could not pay and that were already subordinate to the first mortgage interest. The record reflects no competent, substantial evidence to conclude that these "benefits" equaled the precise amount that PMI agreed to pay the Connecticut Seven. Rather, the damages award specifically disregards the allocation of risk in the profit sharing agreements, which repeatedly provided that PMI was responsible for its debt. As a result, the trial court's order made American Safety the insurer of the Connecticut Seven's ill-fated investment.
The Connecticut Seven did not establish that they provided a benefit directly to American Safety for which American Safety had not paid. Even if they had, the Connecticut Seven did not establish the value of the benefit allegedly conferred.
Accordingly, we REVERSE and REMAND for further proceedings in accordance with this opinion.
SAWAYA and PALMER, JJ., concur.
NOTES
[1] The property came to be owned by PMI rather than the limited partnership.
[2] Both documents refute McMurry's testimony, which the trial court believed, that Connecticut Seven's ultimate conditions were sprung on PMI on the day before closing.
[3] It is undisputed that PMI and McMurry failed to meet this obligation.
[4] We affirmed per curiam cases numbered 5D99-3325, 5D00-3409, and 5D03-1280. Ponce Marina, Inc. v. Am. Safety Reinsurance, Ltd., 795 So.2d 77 (Fla. 5th DCA 2001); Ponce Marina, Inc. v. Am. Safety Insurance, Services, Inc., 871 So.2d 897 (Fla. 5th DCA 2004).
[5] Curiously, the Connecticut Seven apparently did not sue PMI or McMurry after foreclosure and do not now contend that those parties owed them money, and their counsel previously represented PMI and McMurry in the foreclosure appeals.
[6] The finding that American Safety ambushed the plaintiffs and McMurry on the day before closing is clearly erroneous and refuted by documents in the record.