LOGUE, J.
Saul Alvarez appeals a final judgment awarding All Star, Inc. $8.5 million for unjust enrichment following a 14-day jury trial. Alvarez argues that the amount of the damages was not based on competent substantial evidence. We agree, reverse, and remand with instructions.
BACKGROUND
By all accounts, the red-haired, twenty-eight-year-old Saul Alvarez, nicknamed "Canelo," is a rising international star in welterweight and middleweight boxing. As Alvarez himself testified, his 2013 fight against Floyd Mayweather was the second-highest grossing fight in boxing history at the time. Alvarez began his professional boxing career in Mexico at age 15. At an early and formative point in his career, Alvarez received boxing promotional services from All Star Boxing. All Star Boxing provided these services to Alvarez for a 15-month period that ran from September 2008 to December 2009 when Alvarez was approximately 18 years old.
The driving force behind All Star was Feliz Zabala Jr. Zabala has previously been named Latino Promoter of the Year by the World Boxing Organization. Zabala's father was a boxing promoter and Zabala was raised in the boxing industry. By eighteen, Zabala was a trainer and manager. In 2001, Zabala devoted himself full-time to being a promoter. He has promoted approximately 100 fighters-12 have become world champions.
Among other services during the 15 months, All Star obtained nine fights for Alvarez that prepared him for boxing stardom - seven fights in Mexico and two fights in the United States. Some of the fights were broadcast by Telefura Univision network. All Star also obtained a visa for Alvarez to travel to the United States *510 for the fights. It garnered publicity in boxing publications and televised events. It paid for some of Alvarez's expenses including athletic shoes, equipment, air fare, and referee fees. Any money that it might have been entitled to for its work as promoter, it let Alvarez keep. Zabala personally attended some, but not all, fights. All Star viewed Alvarez as an investment. It assumed that if Alvarez reached the top, All Star would then obtain a fair return on investment by sharing the earnings generated by Alvarez's fights. By the end of 2009, All Star believed its effort had brought Alvarez to the verge of stardom.
All Star's expectations came to naught, however, when on January 21, 2010, Alvarez signed an exclusive promotional agreement with a different promoter, Golden Boy Productions, Inc. Golden Boy was an international, top-tier promoter with a track record of organizing fights on Pay-Per-View, HBO, Showtime, ESPN, and Fox, and at such venues as Madison Square Garden in New York and the Staples Center in Los Angeles. Golden Boy paid Alvarez a $1 million signing bonus.
The disappointed All Star sued Golden Boy for tortious interference and Alvarez for breach of contract and unjust enrichment. The jury rejected All Star's claims for tortious interference against Golden Boy and for breach of contract against Alvarez. But it found that Alvarez was unjustly enriched by All Star's services and awarded $8.5 million in damages. The amount of this unjust enrichment award is the only matter on appeal.
At trial, as reflected in the jury instruction, both parties agreed that the damages for unjust enrichment are "either the reasonable value of the labor [All Star] performed and the expenses [All Star] incurred if such labor or expenses conferred a benefit on Mr. Alvarez, or the value of the benefits that Mr. Alvarez received from All Star's labor or expenses."
All Star did not present evidence of a specific dollar figure to reflect the amount of its unjust enrichment damages. Instead, All Star's theory was apparently that the damages for unjust enrichment should be an unspecified percentage of Alvarez's subsequent earnings for all or part of his lifetime.
In this regard, All Star relied upon the testimony of its financial expert, Carl Fedde, a certified public accountant. Fedde's actual assignment was to calculate All Star's lost profits due to the breach of contract claim. He assumed All Star would have made the same as Golden Boy (Alvarez's new promoter), who in turn, would have made the same as Alvarez. Fedde first estimated that Alvarez earned $27 million from boxing in the period from 2010 to 2015 (a number he reduced to $24 million when shown an error in his calculations on cross-examination).
His estimate of $24 million from boxing in the period from 2010 to 2015 was based on his research of the 16 bouts Alvarez fought during this time. Fedde was unable to obtain verified accounting information regarding the revenues and expenses from these fights. He relied on information from sports and boxing newspapers republished on the internet. From these sources, for each of the 16 fights, he separately estimated revenues from the gate, international TV, sponsors, closed circuit TV, other TV, and pay-per-view. He then estimated how the money was distributed to other promoters and pay-per-view providers. Fedde was unable to obtain actual information for line item expenses such as payments to undercard fighters at the fights, insurance, travel, lodging, legal fees, etc. Because of this, as All Star explained in its brief, he instead used a "conservative 50% catch-all category of expense (to cover unknown *511 items)." He then also assumed Alvarez shared proceeds 50/50 with his own promoter, an assumption discussed in more detail below.
After estimating Alvarez's earnings from 2010 to 2015, Fedde next projected Alvarez would earn $135 million from 2016 to 2026. He did so by taking his estimates of the revenue from Alvarez's last five fights during the period of 2010 to 2015 and building similar income and expense projections for each of 21 different hypothetical future fights over the next 10 years. Among other things, he assumed Alvarez would not be injured or disqualified; Alvarez would fight two fights a year; Alvarez would be the star attraction of each fight; revenues would increase as Alvarez's reputation grew; and Fedde's own estimates and assumptions for the period 2010 to 2015 would similarly apply during the period 2016 to 2026, including the generic rate of 50% for expenses and the 50/50 split between boxer and promoter.
Fedde thereby projected that gross revenues from Alvarez's future fights from 2016 to 2026 would reach 1.9 billion dollars. From this amount Alvarez's net profits would be $219,969,428, which Fedde reduced to a present value of $135,042,147 using a five-percent discount rate.
A crucial part of Fedde's calculation concerned how Alvarez and his promoter shared their portion of the take. Some fighters receive zero percent while others receive eighty percent or more. Fedde settled on an estimate of a 50/50 split for both his estimates of past earnings (2010 to 2015) and projection of future earnings (2016 to 2026).
During cross-examination, Fedde struggled to explain how he reached the figure of 50 percent. Fedde initially offered explanations such as "I felt a 50/50 split would be the easiest way"; "[t]he reality was ... that percentage could be between a hundred percent and zero percent and I took the average"; and "I picked 50 percent which is right in the middle." Fedde finally admitted that he selected 50 percent because he simply lacked the information "that would give me a reasonable basis to say whether or not 50 percent is reasonable or not":
Q. Did you have such information?
A. I do not have such information.
Q. And, so the 50 percent, you can't say is reasonable or not, can you?
A. No, Sir
Q. Am I correct?
A. You are correct, sir.
Fedde also conceded that no professional standard allowed him to arrive at the 50 percent figure on such a basis:
Q. Is there anything that you can point to in the forensic accounting business that allows you to simply pick 50 percent when you don't have any information about whether it's zero or a hundred?
A. No, sir.
In addition, Fedde testified that accountants may properly rely upon information from the internet "if, in fact, we can verify it." But he admitted that he was unable to verify significant numbers from the internet that he relied upon in his analysis. On redirect, when All Star's own lawyer attempted to rehabilitate him on this point by asking whether his computing of the lost profits reflected his "independent investigation," Fedde answered "it's not really an independent investigation. It's information I got off the internet. I did not get verifiable information."
Finally, perhaps because the focus of the trial was alleged breach of contract, Fedde never testified as to how Alvarez's earnings could be used to calculate the amount that Alvarez was unjustly enriched by All *512 Star's services. In other words, Fedde never testified how a particular percentage, range, or portion of Alvarez's earnings during all or any part of the 16-year period from 2010 to 2026 could be attributed to the promotional services performed by All Star during the 15-month period from September 2008 to December 2009.
Indeed, again perhaps for the same reason, All Star's entire closing argument regarding damages for unjust enrichment consisted entirely of the following three sentences in which All Star asked the jury to "look back" to Fedde's two income projections of $24 million and $135 million and to "compute" those two figures to determine the damages:
And the last question [on the jury form] is: "What amount of damages is All Star Boxing entitled to as a result of Saul 'Canelo' Alvarez's unjust enrichment?"
The request that we would make at this point is that you look back to Mr. Fedde's testimony. And you have the 24 million and the hundred and, 135 million, and that you compute those two.
The jury found against All Star on its claims for breach of contract and tortious interference. But the jury found for All Star on its claim that Alvarez was unjustly enriched and awarded $8.5 million in damages. In the course of the proceedings below, Alvarez filed motions in limine, moved and renewed a motion for directed verdict, and moved for remittitur based on its contention that Fedde's testimony was speculative. The trial court denied those motions. Alvarez timely appealed.
ANALYSIS
Alvarez argues that the award of $8.5 million was contrary to law because unjust enrichment cannot be based simply upon lost profits and, in any event, the projections of lost profits here were "absurdly speculative." We decline to reach the issue of whether lost profits can ever be used to calculate the damages for unjust enrichment. But we hold that lost profits cannot be used to calculate damages for unjust enrichment in the manner All Star did in this trial.
We review the jury's award of damages to see if it is supported by substantial competent evidence viewing the facts and all reasonable inferences in the light most favorable to the verdict. See, e.g., W. Boca Med. Ctr., Inc. v. Marzigliano, 965 So.2d 240, 244-45 (Fla. 3d DCA 2007) (holding "an award by the jury will not be disturbed if supported ... by substantial competent evidence. A purported award of lost future earning capacity that is not supported by such evidence, in contrast, will be reversed").
Damages for unjust enrichment may be valued based on either (1) the market value of the services; or (2) the value of the services to the party unjustly enriched. Restatement (Third) of Restitution and Unjust Enrichment §§ 49(3)(a) & (c)(2011). See Levine v. Fieni McFarlane, Inc., 690 So.2d 712, 713 (Fla. 4th DCA 1997) (holding it was the benefit to the recipient, not the cost to the provider, which forms the basis for an award in an unjust enrichment case).
Because unjust enrichment damages are economic damages, the amount of damages must be measurable and quantifiable: "[i]t has long been accepted in Florida that a party claiming economic losses must produce evidence justifying a definite amount." United Auto. Ins. Co. v. Colon, 990 So.2d 1246, 1248 (Fla. 4th DCA 2008). "Economic damages may not be founded on jury speculation or guesswork and must rest on some reasonable factual basis." Id. See Swindell v. Crowson, 712 So.2d 1162, 1164 (Fla. 2d DCA 1998) ("Damages cannot *513 be based on speculation, conjecture or guesswork.").
We conclude that the jury's verdict of $8.5 million in damages for unjust enrichment was speculative and is not supported by substantial competent evidence. Fedde's estimate of $24 million was itself speculative for at least two reasons. First, it was based on the assumption of the 50/50 split between Alvarez and his promoter. The percentages selected for this adjustment have an outsized impact on Fedde's final earnings estimate, potentially swinging the final number to be over twice as large or twice as small.[1] Yet Fedde testified he had no basis for the allocation and, in fact, he could not testify that the allocation was reasonable.
On this point, we find the instant case is governed by Department of Transportation v. Samter, 393 So.2d 1142, 1145 (Fla. 3d DCA 1981). In Samter, this court reversed a jury verdict in an eminent domain case where an appraiser could not explain his 50% adjustment to a comparable sale such that "[i]t is clear that the 50% figure ... came only from the top of [the expert's] head." Id. at 1145. We held, "no weight may be accorded an expert opinion which is totally conclusory in nature and is unsupported by any discernible, factually based chain of underlying reasoning." Here, like the testimony rejected in Samter, Fedde's assumption of a 50/50 split came from nowhere other than the top of his head. Like the valuation at issue in Samter, the valuation by Fedde can be given no evidentiary weight.
Secondly, Fedde's estimate of $24 million was speculative because it was formed using unverified numbers from the internet, when Fedde himself testified that accountants could use a number from the internet only "if, in fact, we can verify it." Fedde's use of unverified numbers from the internet in a manner that he testified violated his own standards means his estimates and projections are not "the product of reliable principles and methods." § 90.702, Fla. Stat. (2017). They therefore cannot provide substantial competent evidence to support the jury verdict.
Fedde's projection of $135 million for future earnings from 2016 to 2026 shares these same flawed assumptions and is even more speculative than the estimate of $24 million. Indeed, on appeal, All Star did not even try to defend the projection of $135 million.
But even if Fedde's estimate of $24 million and projection of $135 million were not speculative, the verdict is still not supported by substantial competent evidence because All Star offered no competent way to convert these numbers to $8.5 million in damages for unjust enrichment.
All Star asked the jury to "look back to Mr. Fedde's testimony. And you have the 24 million and the hundred and, 135 million, and that you compute those two." But All Star made no attempt to explain to the jury how this computation might be made. In fact, on appeal, All Star abandoned any attempt to justify its request to the jury to use both $24 million and $135 million to compute unjust enrichment. It refers to Alvarez's argument that projected earnings from 2010 to 2026 were absurdly speculative as a "red herring." Instead of defending what it asked the jury to do, All *514 Star shifts ground and focuses only on Fedde's estimate of $24 million.
The sum and substance of its defense of the $8.5 million verdict is that Alvarez's income of $24 million for the 16 fights during the period from 2010 to 2015 could be allocated to various factors. These factors include Alvarez's own talent and charisma; his trainer and manager; the audience-drawing power of his 16 opponents; the services of his promoter (during these six years, the promoter was Golden Boy); publicity, media exposure, and excitement surrounding each fight; but also to All Star's prior services during 15 months from 2008 to 2009. All Star argues that the jury was free to allocate one third of Alvarez's 2010 to 2015 earnings to the All Star's promotional services during 2008 to 2009.
The problem we have with this argument is the lack of evidence for the quantification: no expert testified to one-third; no other evidence supported one-third; and on appeal, no explanation is proven for one-third. The total absence of any evidence or explanation on how the $8.5 million was derived from the $24 million is fatal. Even assuming earnings could be used to establish unjust enrichment, they could only be used if the plaintiff provided evidence establishing a fact-based chain of reasoning to allocate or quantify to some degree the plaintiff's contribution to those earnings. Perhaps this need not be done with mathematical certainty, but it cannot be based upon an unknown, subjective, unexplainable, and therefore unreviewable method as All Star proposes.
In Walters v. State Road Department of Florida, 239 So.2d 878, 882 (Fla. 3d DCA 1970), this court reversed a jury verdict in an eminent domain case when the amount awarded was based on an appraisal method that the appraiser could not explain at trial. This situation made the position of the opposing party "almost untenable, for there was no way to rebut a secret, purely subjective, formula that existed, if at all, only in the mind of a partisan appraiser." Id. Here, the absence of any explanation regarding how the $8.5 million was derived left Alvarez in a similar impossible predicament-requiring him to rebut "a secret, purely subjective formula." See id.
Also instructive on this point is American Safety Insurance Service, Inc. v. Griggs, 959 So.2d 322, 332 (Fla. 5th DCA 2007). In Griggs, borrowers sued their lenders for unjust enrichment after a foreclosure and received an award of damages. The Fifth District, however, set the award aside because the borrowers offered evidence only of their anticipated profits and "presented no evidence of the value of the benefit conferred upon" the lender. Id. Accordingly, the court reversed because the borrowers "did not establish the value of the benefit allegedly conferred." Id. This is essentially what All Star did here.
Thus, the total absence of any evidence (by expert opinion or otherwise) or logical explanation describing how the jury could have reached the allocation that one-third of the 2010-2015 earnings were generated by services provided in 2008-2009 means the allocation is not supported by substantial competent evidence.
All Star cites to Kane v. Stewart Tilghman Fox & Bianchi, P.A., 85 So.3d 1112, 1114 (Fla. 4th DCA 2012) in support of the jury's verdict, but Kane is in accord with our decision. Kane involved a claim of unjust enrichment by one set of lawyers against another. The plaintiffs claimed the defendants were unjustly enriched when, after the defendants had asked for and received the plaintiffs' legal advice and services, the defendants obtained a lucrative settlement of an extensive and complex series of lawsuits against an insurance carrier. The court upheld an award to the *515 plaintiffs based on unjust enrichment because (1) substantial competent evidence established the settlement proceeds were produced by the work of both sets of attorneys and (2) substantial competent evidence (in the form of testimony of a lawyer expert in the exact type of lawsuits and settlements at issue) established that 50% of the settlement was attributable to work of the plaintiffs. Here, in contrast, there is no substantial competent evidence either for the $24 million estimate or for the method to allocate a portion of that estimate to All Star's services. For this reason, the judgment must be reversed.
ON REMAND
While the record fails to support the judgment of $8.5 million, the fact still remains that the jury found that Alvarez was unjustly enriched by All Star's services during 2008-2009. The record appears to contain evidence of the amount of All Star's out of pocket expenses and the value of All Star's services, for example, by way of the testimony of Rafael Mendoza, who at least suggested a number, although we do not decide whether such evidence is competent. Also, Alvarez's request for relief in this court commendably acknowledged the case should be remanded for entry of a judgment for All Star's out-of-pocket expenses. We therefore reverse and remand with instructions for the trial judge to vacate the current final judgment; to reconsider the motion for remittitur; to enter a judgment of remitter if there is evidence of the value of All Star's expenditures and services in the existing record or, if not, a judgment for the defense; and for further proceedings consistent with this opinion.
Reversed and remanded.

To give one example, compare a split of 50% to the promoter and 50% to the boxer against a split of 20% to the promoter and 80% to the boxer (which Alvarez actually received for some fights). If the amount being split was $1,000 dollars, the first split gives the promoter $500 while the second split gives the promoter $200. The increase of 30 percentage points from 20% to 50% reflects a relative 250% increase in the dollar amount of the earnings estimate.