DAVIS, Judge.
Neil N. Malamud challenges the trial court’s final judgment awarding Jim D. Syprett $179,222.42 as damages in Mr. Sy-prett’s action against Mr. Malamud for unjust enrichment. Mr. Syprett cross-appeals, arguing that the trial court erred in granting summary judgment in Mr. Malamud’s- favor on his claim of equitable contribution and in ruling in Mr. Malamud’s favor on his claim of equitable subrogation. We affirm all aspects of the trial court’s final judgment.
Twelve investors formed Osprey Inn, LLC (OIL), for the purpose of operating the Osprey Inn in Sarasota County. The individual members of OIL owned varying interests in the business based upon the amount of their individual investments. Mr. Malamud owned a 22% interest in OIL, and Mr. Syprett owned a 7% interest. In April 2004, OIL borrowed $2.8 million from Bank of America. As part of the transaction, Bank of America required each of OIL’s individual members to sign a personal guaranty for the loan. The loan was later modified to provide additional funding. Again the individual investors signed guarantees acknowledging the modified loan amount, which was increased to $3,137,500. Each guarantor’s individual guaranty was capped at 120% of his or her individual ownership interest. So based *436 on his 7% interest in OIL, Mr. Syprett’s guaranty was limited to 8.4% of the amount that would be owed in the event OIL was to default on the modified loan. And Mr. Malamud’s guaranty was limited to 26.4% of the amount that would be owed upon default.
In June 2006, Mr. Malamud sold his interest in OIL but remained personally liable for his share of the Bank of America loan based on the personal guaranty he signed. The Osprey Inn subsequently encountered financial difficulties, and OIL borrowed $250,000 from Maleo Industries, Inc., an entity controlled solely by Mr. Malamud. A second mortgage on the property served as collateral for the loan, and the loan was not secured by individual guaranties.
Bank of America declared its loan to be in default on January 23, 2009. . The amount owed to the bank at that time was $3,148,599. Notices of default were given to both OIL and the individual guarantors. Mr. Malamud decided to protect his invest-; ment and himself by forming NNM2009, LLC, a limited liability company of which he was the sole member. Through that entity, Mr. Malamud purchased the note held by Bank of America for a discounted price of $3,017,94o.[1] This price represented only the outstanding principal owed on the note. Upon purchasing the note, NNM also received an assignment of the mortgage on the real estate and assignments of each of the individual guaranties signed by OIL’s members.
NNM then made demands on the guarantors pursuant to their individual guaranties. However, NNM agreed to apply each guarantor’s respective percentage to the reduced amount that it had paid for the note instead of the entire outstanding obligation, which included the principal plus interest and back taxes. In response to this demand, Mr. Syprett paid to NNM $253,507, which represented 8.4% of the $3,017,940. In addition, three other guarantors paid their respective shares, one paying the same amount as Mr. Syprett, another paying $380,231.34, and a third making a partial payment of $20,000.[2] The remaining guarantors failed to respond to NNM’s demand, resulting in NNM filing a civil action against them based on their individual guaranties.[3]
NNM then learned that OIL had entered into a contract for the sale of the real property. NNM therefore delayed further action against the remaining guarantors. The sales transaction closed on July 10, 2009. At NNM’s direction, $283,092.85 of the sales proceeds was applied to the principal and interest that OIL owed Maleo Industries on the second mortgage.
NNM then contacted the remaining guarantors and collected a total of $521,000 from them.[4] To each guarantor who paid on the debt, NNM gave a release from liability, and the lawsuit against the remaining investors was voluntarily dismissed. However, even though NNM did not collect any funds from Mr. Malamud individually on his personal guaranty of *437 the Bank of America loan, he did receive a release from NNM on his personal guaranty. NNM offered partial refunds to Mr. Syprett and the other two investors who had paid their full share of the default obligation. Mr. Syprett refused the refund, asserting that he was owed more than what was being offered.[5] He maintained that the amount that he would have paid after applying an offset for the partial refund would still be more than his 8.4% share of the obligation as a guarantor if his 8.4% was applied to the default obligation minus the sales proceeds. This was underscored by the facts that Mr. Malamud individually received a release from his personal guaranty without making any payment to NNM and that NNM was made whole even without any payment from Mr. Malamud.
Mr. Syprett then filed this action against Mr. Malamud individually, alleging counts for equitable contribution, equitable subro-gation, and unjust enrichment. The trial court found that there was no common obligation that would render the guarantors joint and severally liable. Based on this finding, the trial court ruled in Mr. Malamud’s favor on the counts for equitable contribution and equitable subrogation. However, the trial court allowed the claim for unjust enrichment to go forward.
In order to state a cause of action for unjust enrichment, Mr. Syprett had to allege and prove (1) that he conferred a benefit upon Mr. Malamud; (2) that Mr. Malamud was aware of the benefit; and (3) that Mr. Malamud’s acceptance and retention of the benefit without paying for it was an unjust enrichment to Mr. Malamud and inequitable to Mr. Syprett. See Ruck Bros. Brick, Inc. v. Kellogg & Kimsey, Inc., 668 So.2d 205, 207 (Fla. 2d DCA 1995). Mr. Syprett alleged these elements in his complaint.
The trial court determined that Mr. Malamud did accept and enjoy a benefit in that he individually was relieved of any liability under the guaranty without making any payment on the obligation. Further the court determined that NNM released Mr. Malamud personally from the guaranty because it had been made whole by the payment of the investors, including Mr. Syprett’s payment in excess of the 8.4% of the amount owed after application of the sale proceeds. The trial court therefore concluded that it was Mr. Sy-prett, by his overpayment, who had conferred the benefit upon Mr. Malamud. Accordingly, the trial court ruled that Mr. Syprett had proven his claim of unjust enrichment and entered a judgment against Mr. Malamud individually in the amount of $179,222.42, which represented Mr. Syprett’s overpayment of $155,158 plus prejudgment interest. It is this final judgment that Mr. Malamud now challenges.
Mr. Malamud argues (1) that the record does not support a claim for unjust enrichment because Mr. Syprett did not confer any direct benefit on Mr. Malamud and (2) that a claim for unjust enrichment cannot be brought by Mr. Syprett in these circumstances because Mr. Syprett has a remedy at law — namely, a breach of contract claim against NNM. We reject both arguments.
As to his first argument, Mr. Malamud maintains that any benefit he received in the form of a release from his personal guaranty without payment was a benefit conferred by NNM — not Mr. Syprett. Mr. Malamud argues that NNM is a separate legal entity that purchased the note *438 and the guaranties from Bank of America and that Mr. Syprett’s overpayment to NNM may only be seen to have conferred a benefit on NNM. We do not agree.
We acknowledge that in order to support a claim of unjust enrichment, a plaintiff must show that the defendant received a direct benefit from the plaintiff. See Extraordinary Title Servs., LLC v. Fla. Power & Light Co., 1 So.3d 400, 404 (Fla. 3d DCA 2009). However, in its final judgment, the trial court determined that Mr. Malamud’s release from paying his share of the debt pursuant to his personal guaranty was a specific benefit he received. This benefit was possible only because Mr. Syprett overpaid on his share of the outstanding obligation. Although the trial court did not use the term “direct benefit,” the implication of the finding is that the benefit was directly related to Mr. Syprett. .
The evidence presented at trial demonstrated that Mr. Malamud was the sole member of NNM. As such, he was fully aware of Mr. Syprett’s overpayment to NNM — in fact, he requested it.[6] Additionally, the manner in which the proceeds of the sale of the real estate were distributed supports the conclusion that Mr. Malamud was personally aware of, and in fact directing, the financial dealings of Maleo Industries and NNM. When the Osprey Inn was sold, there were two mortgages on the real property. The first mortgage, originally held by Bank of America, was held by NNM at the time of the closing. The second mortgage was held by Maleo Industries. The sale price on the property was insufficient to satisfy the first mortgage. However, the closing documents reflect that $283,000 of the sale price was used to satisfy the second mortgage and earned interest owed to Maleo Industries, with only the remaining proceeds applied to the first mortgage held by NNM. For the second mortgage holder to be paid prior to the the first mortgage holder would require the acquiescence of the first mortgage holder — NNM, whose sole member was Mr. Malamud. This favoring of the second mortgage held by Maleo Industries, an entity also controlled by Mr. Malamud, was to accomplish what Mr. Malamud had told Mr. Syprett he intended to do, i.e., protect himself. As Mr. Malamud testified at trial, he was directing these transactions with the understanding that all the money involved was his personally, whether titled in the name of Maleo Industries or NNM or Neil Malamud.
NNM, as the holder of the note, was repaid all of the money it had paid for the purchase of the note after applying the proceeds of the sale and collecting the payments from the guarantors without Mr. Malamud’s having to contribute any of his 26.4% of the $3,017,940. Because this benefit was made possible only by Mr. Sy-prett’s overpayment, Mr. Malamud person *439 ally was unjustly enriched by a benefit conferred to him by Mr. Syprett. See Huntsman Packaging Corp. v. Kerry Packaging Corp., 992 F.Supp. 1439, 1446 (M.D.Fla.1998) (concluding that a claim for unjust enrichment is actionable against the principal of a corporation which received value from the plaintiff where the principal was directing corporate operations and noting that “it would be most inequitable for [the principal] to accept the benefit conferred by plaintiffs without compensating them”). Accordingly, Mr. Malamud should be held personally responsible to Mr. Syprett for that unjust enrichment.
Mr. Malamud also argues on appeal that the claim for unjust enrichment is barred because there is an action in contract available to Mr. Syprett against NNM. We do not agree.
It is true that by signing the personal guaranty, Mr. Syprett entered into a contract with Bank of America and that subsequently that contract was assigned to NNM. That contract obligated Mr. Syprett to pay a portion of any amounts owed by OIL upon its default on the note and mortgage given to Bank of America. At the time Mr. Syprett paid NNM on that contract, Mr. Syprett paid what was rightfully due under the contract. It was only after Mr. Syprett paid NNM pursuant to the contract that NNM collected the real estate sales proceeds and released Mr. Malamud from his guarantee. Nothing in the contract between Mr. Syprett and NNM addressed NNM’s treatment of other guarantors. As such, Mr. Syprett cannot establish a breach of that contract and does not have a remedy at law.
On appeal, Mr. Malamud also argues that if a judgment for unjust enrichment is appropriate, the trial court’s determination of damages is in error because the other investors who underpaid their contractually obligated amounts also are receiving a benefit based on Mr. Syprett’s overpayment. This argument was not made below, and we will not consider it for the first time on appeal. See W. Fla. Reg’l Med. Ctr., Inc. v. See, 79 So.3d 1, 13 (Fla.2012) (“ ‘[A] reviewing court will not consider points raised for the first time on appeal.’ ” (quoting Castor v. State, 365 So.2d 701, 703 (Fla.1978))).
Mr. Syprett also cross-appeals, arguing that the trial court erred by denying his claims of equitable subrogation and equitable contribution. We affirm these rulings of the trial court without comment.
Affirmed.
CRENSHAW and MORRIS, JJ., Concur.

. Mr. Malamud contacted Mr. Syprett seeking Mr. Syprett’s involvement in the purchase of the note to protect himself from liability on the guaranty. Mr. Syprett declined the offer but was aware of Mr. Malamud’s attempt to protect himself personally from loss.

. The total NNM received from these four investors was $907,245.34.

. The lawsuit filed by NNM did not name Mr. Malamud as a defendant.

. Each of these payments was less than what would have been required to satisfy the obligation owed by OIL to NNM as holder of the note. Mr. Malamud instructed these guarantors that there would be no closing of the sale until these funds were paid.

. The other two investors who had overpaid accepted the partial refund and released Mr. Malamud personally and Mr. Malamud's entities from further liability for the transaction.

. Although the trial court did not make a finding that NNM was but the alter ego of Mr. Malamud, the facts support that Mr. Malamud, Maleo Industries, and NNM were, in essence, all the same entity. This, at least, was Mr. Malamud's understanding. When asked whether he personally had paid any amount on his personal guaranty, he responded that he had paid $330,000. Mr. Syprett’s attorney then asked if this sum represented the monies paid by NNM as the partial refund to the other two investors who had paid their full obligations before the application of the proceeds of the sale. Mr. Malamud responded "That is correct.” In response to a separate question, Mr. Malamud responded: "I paid $330,000 of money that was my money. 'Mine,' meaning NNM2009, and Maleo Industries.” He then clarified that this $330,000 is in fact the same money that he asserts he paid pursuant to his personal guaranty. In other words, Mr. Malamud himself was suggesting that the funds of NNM and Maleo Industries, Inc., were considered by him to be "my money.”