[PUBLISH]

In the

United States Court of Appeals

For the Eleventh Circuit

_____

No. 22-12335

_____

TAXINET CORP.,
a South Dakota corporation,

　　　　　　　　　Plaintiff-Counter Defendant-Appellant,

LUIS NOBOA,

　　　　　　　　　Counter Defendant-Appellant,

PEDRO DOMIT,

　　　　　　　　　Counter Defendant,

*versus*

SANTIAGO LEON,
an individual,

　　　　　　　　　Defendant-Counter Claimant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:16-cv-24266-FAM

_____

Before JORDAN and ROSENBAUM, Circuit Judges, and MANASCO,[*]
District Judge

JORDAN, Circuit Judge.

Taxinet Corporation sued Santiago Leon, asserting a number of claims arising from what began as a joint effort to gain a government concession for a taxi-hailing app in Mexico City. The district court granted summary judgment in favor of Mr. Leon on all of Taxinet's claims except for a Florida-law unjust enrichment claim. That claim proceeded to trial along with Mr. Leon's counterclaims for fraudulent misrepresentation and negligent misrepresentation.

The jury found in favor of Taxinet on its unjust enrichment claim and awarded it $300 million. The jury also found in favor of Mr. Leon on his negligent misrepresentation claim and awarded him $15,000. Following the verdict, the district court granted Mr. Leon's renewed Rule 50(b) motion for judgment as a matter of law,

_____

[*] Honorable Anna Manasco, United States District Judge for the Northern District of Alabama, sitting by designation.

concluding that the award of damages was based on hearsay evidence that had been improperly admitted and was speculative.

Taxinet now appeals. After a review of the record, and with the benefit of oral argument, we affirm the district court's Rule 50(b) order. The district court did not abuse its discretion in ruling that most of Taxinet's evidence of the venture's valuation at trial—which formed the basis for the calculation of damages on the unjust enrichment claim—constituted inadmissible hearsay and should not have been admitted. And once that inadmissible valuation evidence was excised from the sufficiency analysis, there was not enough evidence to support the jury's $300 million award under Florida law.

But for a number of reasons, we exercise our discretion to remand for a new trial on the unjust enrichment claim. First, Taxinet introduced sufficient evidence from which a jury could have found that it conferred a benefit on Mr. Leon, that he accepted the benefit, and that it would be inequitable to allow him to retain the benefit without paying for it. Second, Taxinet presented evidence which, though insufficient to sustain the $300 million award, could form the foundation for some award of damages for Mr. Leon's unjust enrichment. Third, the district court admitted Taxinet's hearsay evidence on valuation during the trial and changed its mind about admissibility only after the jury rendered its verdict. Taxinet, it seems to us, understandably relied on the evidence admitted at trial, and could have asked for damages (albeit a reduced

sum) under a different theory had the court ruled during trial that the challenged valuation evidence was inadmissible.[1]

## I

This story begins in 2015—two years after *USA Today* named Uber the tech company of the year.

## A

Taxinet, which is incorporated in South Dakota, successfully developed a taxi-hailing app in Guayaquil, Ecuador. It decided it wanted to enter the Mexico City market, which has the largest number of taxis in the world. It thought that the nearly 140,000-taxi fleet there could benefit from an app that would allow users to call a taxi from anywhere, much like they can with Uber and Lyft.

To that end, Luis Noboa, Taxinet's principal, teamed up with Pedro Domit and Mr. Leon, a former Mexico City congressman and the defendant in this case. There was no written agreement, but Mr. Noboa and Mr. Domit considered themselves Mr. Leon's partners.

Together, Messrs. Noboa, Domit, and Leon worked to earn a government concession that would make their group the exclusive provider of app-based taxi hailing in Mexico City. They first met with Mexico City's Secretary of Mobility on August 17, 2015. Then, on September 25, 2015, after a second meeting, they found

---

[1] Because we are remanding for a new trial, we do not address any arguments relating to setoff. As to any other issues not specifically discussed, we summarily affirm.

some success.  Mr. Leon sent a text to Mr. Noboa saying the concession was theirs: "We closed, Lucho! The Secretary [of Mobility] announced it."  Mr. Leon also sent a text to Mr. Domit with a similar message: "We closed in Mexicoooooo!!!"  Mr. Domit, for his part, considered the matter a "done deal" at that time.  According to Mr. Leon, however, the actual concession was formally awarded only nine months later, in June of 2016, following the publication of a declaration of need.

A new Mexican company was needed for the concession, and that led to the formation of Lusad S. de R.L.—a Mexican entity—on October 15, 2015.  Lusad stood for "Lucho [Noboa], Santiago [Leon] and [Pedro] Domit."

L1bre Corporation, which is wholly owned by Mr. Leon, owns 99.9% of Lusad.  Another person, Eduardo Zayas, owns the other 0.1% of Lusad.  But Mr. Noboa testified that he was the 60% owner of Lusad based upon his agreement with Mr. Leon.

At some point shortly after his text messages to Messrs. Noboa and Domit, Mr. Leon decided that he wanted out of the triumvirate due to a number of issues.  On October 24, 2015, he sent an email to the other two men with an offer.  Mr. Leon would give them 25% of Lusad—a number that will come to matter later—and they could part ways. Mr. Noboa declined the offer. The next day, Mr. Leon alone met with "angel investors" on behalf of the venture and afterward continued to work on the Mexico City venture without Taxinet or Messrs. Noboa and Domit.

6                    Opinion of the Court                    22-12335

Five months later, in March of 2016, Mexico City published a declaration of need that included a description of services that the newly formed Lusad had offered.  On June 17, 2016, the Mexican government issued an official 10-year concession to Lusad, which, as noted, was almost wholly owned by Mr. Leon through L1bre.[2]

**B**

Taxinet sued Mr. Leon in Florida state court, asserting claims for breach of a joint venture agreement, tortious interference, violation of Florida's Deceptive and Unfair Trade Practices Act, and promissory estoppel.  Mr. Leon removed the case to federal court pursuant to 28 U.S.C. §§ 1332, 1441, and 1446.

Mr. Leon asserted counterclaims for fraudulent misrepresentation, negligent misrepresentation, fraudulent concealment, civil conspiracy, and breach of fiduciary duty against Taxinet and Messrs. Noboa and Domit.  But Mr. Leon never served Mr. Domit, and all counterclaims as to him were eventually dismissed.

By the time of trial, the only claims remaining were Taxinet's unjust enrichment claim against Mr. Leon and Mr. Leon's counterclaims against Taxinet and Mr. Noboa for fraudulent misrepresentation and negligent misrepresentation.

---

[2] As set out later, Mr. Noboa testified that Mr. Leon later sued Mexico City for wrongfully appropriating the concession and sought $2.4 billion in damages.

## II

To prevail on its unjust enrichment claim, Taxinet had to prove that it conferred a benefit on Mr. Leon, that he appreciated the benefit, and that his acceptance and retention of the benefit under the circumstances made it "inequitable for him to retain it without paying the value thereof." *Pincus v. Am. Traffic Sols., Inc.*, 333 So. 3d 1095, 1097 (Fla. 2022) (citation and internal quotation marks omitted). *See also Agritrade, LP v. Quercia*, 253 So. 3d 28, 33 (Fla. 3d DCA 2017) ("The elements of a cause of action for unjust enrichment are: (1) plaintiff has conferred a benefit on the defendant, who has knowledge thereof; (2) defendant voluntarily accepts and retains the benefit conferred; and (3) the circumstances are such that it would be inequitable for the defendant to retain the benefit without first paying the value thereof to the plaintiff."); *Cape, LLC v. Och-Ziff Real Estate Acquisitions LP*, 370 So. 3d 1010, 1016 (Fla. 5th DCA 2023) (same).

## A

The value of the Mexico City concession (and its effect on the worth of Lusad and L1bre) was a significant issue at trial. One number that kept coming up was $2.4 billion, a figure taken from a 2018 Goldman Sachs valuation of L1bre, which, as noted, is wholly owned by Mr. Leon and which owns 99.9% of Lusad. The district court excluded the Goldman Sachs report on hearsay grounds. Yet, as explained below, it allowed Messrs. Leon and Noboa to testify about it.

Taxinet called Mr. Leon as its first witness. He testified several times on direct examination—over hearsay objections by his counsel—that L1bre was valued at $2.4 billion.

When Taxinet's counsel questioned Mr. Leon about the value of the concession over five years, he said that there was "no valuation" at the time of the negotiations with the Mexico City government. The valuation question was posed again, and his counsel objected on grounds of speculation, foundation, misleading the jury, and relevance. The district court overruled those objections, and Mr. Leon explained that there had been three different valuations. Before he mentioned any numbers from the valuations, his counsel objected on hearsay grounds. The district court agreed that the testimony sought would be hearsay but allowed the question. *See* D.E. 334 at 127 (district court: "Yes, it is, but I'm going to let it in. Go ahead and tell us what the valuations were that you were told."); D.E. 335 at 121 (district court: "I'm going to let him [Mr. Leon] testify as to what he thought the business was worth and whether he thought it was speculation or no big deal.").

Mr. Leon then testified that there was one valuation from Goldman Sachs for $2.4 billion, a second one from LionTree for $450 million, and a third one he could not recall. When asked if he had "ever stated under oath that the value of the concession was $2.4 billion," he said yes.

Taxinet tried to introduce the Goldman Sachs valuation report into evidence as an exhibit, but Mr. Leon's counsel objected on hearsay grounds. Following a discussion with counsel, the

district court sustained Mr. Leon's hearsay objection to the admission of the valuation report.  *See* D.E. 335 at 118.

The examination of Mr. Leon continued, and he explained that L1bre had engaged Goldman Sachs as its investment banker when other companies had made approaches about strategic alliances or joint ventures.  Goldman Sachs fixed the "enterprise value" of the Mexico City concession at $2.4 billion.  According to Mr. Leon, "the $2.4 billion valuation was because we worked on it for years and years and got investment for over a hundred million dollars into the project, and that's how we were able to achieve that valuation."  L1bre did not pay Goldman Sachs for the valuation; Goldman Sachs would be paid when it presented possible corporate opportunities and/or transactions to L1bre.

Mr. Leon said that Goldman Sachs issued its valuation after Lusad was "fully funded for the full rollout," and "financially backed by capital, sufficient for the installation of 138,000 taxis, [and] all of those ingredients made Goldman Sachs' value[.]" When asked what he thought of this valuation, Mr. Leon said he believed "Goldman [Sachs] took a conservative approach to the valuation."  He explained that Lusad had invested over $100 million in the Mexico City project and expected a revenue stream in the "billions of dollars" over the 10-year period of the concession.

Up to this point, all of the questions about valuation, including those about the Goldman Sachs valuation, had been put to Mr. Leon by Taxinet's counsel on direct examination.  But when asked by his own counsel about the value of the taxi-hailing app program

in October of 2015, Mr. Leon answered that it "had no value for us" due to purported issues and problems with Taxinet.

Mr. Noboa was Taxinet's second witness, and he too hinted at the $2.4 billion valuation, albeit indirectly. Over a hearsay objection, he testified that Mr. Leon had filed suit in New York against Mexico City for expropriating the concession and was seeking $2.4 billion in damages in that action. With respect to the parties' relationship, Mr. Noboa claimed that he rightfully owned 60% of Lusad, though he had never been issued any stock certificates. He also asserted that Mr. Leon benefited from the project that they started together. *See* D.E. 335 at 180, 185–86.

Taxinet also called Mr. Domit, who testified he was to be part owner of the venture, as a witness. He did not provide any testimony about the valuation of Lusad or L1bre at any point in time, but he did explain that he had done some financial modeling of his own for the venture. Depending on certain assumptions he made and variables he used in the modeling (e.g., the cost of tablets for the taxis, the cost of advertising, the cost of installation, the commission percentage (which had not been set), the number of taxi trips, and the revenue per taxi trip), Mr. Domit came up with a capital cost of between $500,000 and $20 million, and a profit (using the $20 million capital cost figure) of $1.6 billion in five years (i.e., by 2020 or 2021). *See* D.E. 336 at 38–41, 103–06. When Mr. Leon's counsel asked Mr. Domit if his financial modeling was "just somewhat of guesswork," he responded that "[y]ou could call it informed guesswork," explaining it was informed "because we knew

22-12335                Opinion of the Court                11

more or less what the cost of the tablets would be." *Id.* at 106. There were no objections to Mr. Domit's testimony on these issues.

### B

Towards the end of the trial, the district court engaged in a long discussion with the parties about the jury instructions and the evidence concerning the damages sought by Taxinet on its unjust enrichment claim. The court acknowledged that an owner can express an opinion about the value of his business, but expressed some doubt as to whether such testimony in this case, based as it was on the 2018 Goldman Sachs valuation, would be enough for the jury to fix the value of the benefit conferred on Mr. Leon by Taxinet in 2015. *See* D.E. 336 at 68–90.

At the close of Taxinet's case, Mr. Leon moved for judgment as a matter of law under Rule 50(a) of the Federal Rules of Civil Procedure. He argued, in part, that there was insufficient evidence of the value of the benefit he received from Taxinet in 2015. *See* D.E. 336 at 120–21.[3]

Taxinet responded that it had presented sufficient evidence of damages under two theories: the value of services rendered, and the value received by Mr. Leon in the form of the concession

---

[3] After the jury returned its verdict, Mr. Leon filed a renewed Rule 50(b) motion in which he argued that there was insufficient evidence of the benefit he purportedly received from Taxinet's efforts, or of the value of any such benefit. *See* D.E. 290 at 12–18.

granted by the Mexican government. Taxinet also pointed out that Mr. Leon had testified several times about the Goldman Sachs valuation of L1bre (and hence Lusad). *See id.* at 122–23.

The district court "reluctantly" denied Mr. Leon's motion for judgment as a matter of law. *See id.* at 124. The court repeated its concern about the value of the benefit received or how the jury could fix the market value of what Mr. Noboa and Taxinet provided to Mr. Leon in 2015. The court said that it would "try to figure it out later" after Mr. Leon presented his case. *See id.* at 124–25.

At the charge conference, the district court again discussed the sufficiency of the evidence regarding Taxinet's unjust enrichment damages. The court explained that there was testimony about the $2.4 billion valuation by Goldman Sachs but pointed out that it had not allowed the valuation report to be introduced as an exhibit because it constituted hearsay. *See id.* at 151. Taxinet's counsel reminded the court that it had allowed Mr. Leon to testify about the Goldman Sachs valuation and asserted that a business owner could testify about the value of his company. *See id.* at 151–52. The court responded by saying it did "[not] know if [that was] enough," as no one from Goldman Sachs had explained how or why the valuation report was prepared. *See id.* at 152. When Taxinet's counsel responded that Mr. Leon had put a value on Lusad, the court replied that "the law in unjust enrichment is not what the owner thinks he lost" and said that the valuation could not be speculative. *See id.* at 153. Mr. Leon's counsel maintained that the

evidence had to relate to the value of the benefit provided and not to the valuation of the business. *See id.* at 159.

The district court ultimately gave the following jury instruction on damages for Taxinet's unjust enrichment claim:

> The Plaintiff first must prove that the defendant Leon's action caused the damage and that Leon benefited from that action. If so, then there must be some standard or 'yardstick' by which the amount of damages may be adequately determined. An award of damages must be measurable and quantifiable. Although you need not determine damages with arithmetic precision, damages cannot be based on speculative conjecture or guesswork. It is only actual damages that are recoverable based on the actual evidence presented in court.

D.E. 274 at 8.

In closing argument, Taxinet asked the jury for an award of $400 million, or 25% of Mr. Domit's $1.6 billion profit figure after five years. This sum, Taxinet argued, would put Mr. Noboa where "he would have been." Taxinet also told the jury that it could use the $2.4 billion valuation by Goldman Sachs as a marker. *See* D.E. 339 at 35–37.

During deliberations, the jury sent a note with a question to the district court. It read: "We are trying to evaluate the market value of services. We are trying to evaluate what a 'yardstick' of measurement would be. What do we do if no yardstick is found[?]" The district court brought the jury in and explained that there were several options: it could provide other definitions of "yardstick;" or

the jury could go home and think about the matter overnight; or the jury could ask further questions requesting additional guidance.  *See* D.E. 339 at 105–08.  The jury subsequently sent a note saying it hoped to finalize its deliberations that night, which it did.  *See id.* at 108–09, 129.

The jury found that Mr. Leon obtained a benefit from Taxinet through September 25, 2015—the day Mr. Leon first texted Messrs. Noboa and Domit that the Secretary of Mobility had agreed to the concession.  The jury awarded Taxinet $300 million, and added a note to the verdict explaining its calculation of the award:

> $2.4 Billion – value by Goldman Sachs
> Email on Oct. 24, 2015 offered break-up
> 25% to be given to Noboa and Domit
> 12.5% of total amount

D.E. 276 at 2.

In addition, the jury found for Mr. Leon on his counterclaim for negligent misrepresentation against Taxinet and Mr. Noboa.  It awarded Mr. Leon $15,000.

After the trial, Mr. Leon moved for judgment as a matter of law under Rule 50(b), contesting the sufficiency of the evidence.  The district court granted the motion, concluding that "the evidence is insufficient to support a finding of damages, let alone the verdict in this case."  D.E. 302 at 1.  The court explained that Taxinet had not presented any expert testimony as to the value of any benefit or services provided to Mr. Leon in 2015, and that the jury's

award was "based on hearsay and speculation." *Id.* at 2. The court also believed that the jury found it difficult to calculate damages because it asked which yardstick to use to measure damages during deliberations. *See id.* at 2, 5–6, 9.

Specifically, the district court questioned how the value of a benefit conferred on Mr. Leon in 2015 could be calculated based on the $2.4 billion Goldman Sachs valuation from 2018 (as to which Mr. Leon had testified). First, the court noted that any evidence of valuation in 2018 would have been too speculative as to the benefit conferred on Mr. Leon in 2015, and that, as a result, "there is no evidence of the market value of Taxinet's purported services or benefit conferred." *Id.* at 10. Second, the court thought the events in question were too attenuated to show that a benefit was conferred in 2015: "The time that elapsed alone is sufficient to eviscerate the casual connection, let alone the evidence that [Mr.] Leon worked with software engineers and other partners to develop the product in the months leading to the official award." *Id.* at 11.

## III

In Florida, damages for an unjust enrichment claim may be calculated as either "(1) the market value of the services; or (2) the value of the services to the party unjustly enriched." *F.H. Paschen, S.N. Nielsen & Assocs. LLC v. B&B Site Dev., Inc.*, 311 So. 3d 39, 50 (Fla. 4th DCA 2021) (internal citations omitted). "The measure of damages for unjust enrichment is the value of the benefit conferred, not the amount the plaintiff hoped to receive or the cost to the plaintiff." *Id. See also Kane v. Stewart Tilghman Fox & Bianchi,*

P.A., 85 So. 3d 1112, 1115 (Fla. 4th DCA 2012) ("[D]amages for unjust enrichment are based on value from [the] standpoint of the recipient of the benefits."). Importantly, there must be "some standard or 'yardstick' by which the amount of damages may be adequately determined." *Montage Grp., Ltd. v. Athle-Tech Comput. Sys., Inc.*, 889 So. 2d 180, 195 (Fla. 2d DCA 2004). "Because unjust enrichment damages are economic damages, the amount . . . must be measurable and quantifiable[.]" *Alvarez v. All-Star Boxing, Inc.*, 258 So. 3d 508, 512 (Fla. 3d DCA 2018).[4]

## A

We review a district court's entry of judgment as a matter of law de novo, *see Brown v. R.J. Reynolds Tobacco Company*, 38 F.4th 1313, 1323 (11th Cir. 2022), and apply the same standards as the district court. That means "we consider all the evidence, and the inferences drawn therefrom, in the light most favorable to the nonmoving party." *Advanced Bodycare Sols., LLC v. Thione Int'l, Inc.*, 615 F.3d 1352, 1360 (11th Cir. 2010). With respect to the compensatory damages for the unjust enrichment claim, we "evaluate the propriety of the award under state law." *Kerrivan v. R.J. Reynolds Tobacco Co.*, 953 F.3d 1196, 1204 n.6 (11th Cir. 2020).

---

[4] Sometimes unjust enrichment damages can be calculated under a "disgorgement theory." *See Montage Grp.*, 889 So. 2d at 196. But here that theory is not in play because the evidence at trial established that Mr. Leon has not made any money from the taxi-hailing app project, in part because he claims that Mexico City wrongfully expropriated the concession Lusad had been awarded. *See, e.g.,* D.E. 335 at 141.

Our task is to determine whether the evidence was "legally sufficient" to support the jury's verdict. *See, e.g.,* Rule 50(b); *McGinnis v. Am. Home Mortg. Servicing, Inc.*, 817 F.3d 1241, 1254 (11th Cir. 2016). This "standard is heavily weighted in favor of preserving the jury's verdict." *Pensacola Motor Sales Inc. v. E. Shore Toyota, LLC*, 684 F.3d 1211, 1226 (11th Cir. 2012). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a [court]," and we must "disregard all evidence favorable to the moving party that the jury is not required to believe." *Cleveland v. Home Shopping Network, Inc.*, 369 F.3d 1189, 1193 (11th Cir. 2004) (quoting *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150–51 (2000)). Ultimately, "we will 'disturb the jury's verdict only when there is no material conflict' as to the evidence and where no reasonable juror could agree to the verdict." *Brown*, 38 F.4th at 1323 (internal citations omitted).[5]

There is, however, a significant caveat to this standard. It used to be the law in this circuit that in ruling on a motion for judgment as a matter of law "a district court [could] not exclude

---

[5] In its Rule 50(b) order, the district court relied in part on the jury's note about the appropriate "yardstick." That was likely a mistake. A sufficiency analysis involves only a review of the evidence and does not extend to matters like the reasoning the jury used to reach its verdict. *See Chaney v. City of Orlando, Fla.*, 483 F.3d 1221, 1228 (11th Cir. 2007) (explaining that a district court errs "[b]y placing an undue emphasis on the jury's particular findings . . . and by repeatedly making decisions on the Rule 50 motion through the lens of what the jury found").

previously admitted evidence" on the ground that its admission was improper. *See Jackson v. Pleasant Grove Health Care Ctr.*, 980 F.2d 692, 696 (11th Cir. 1993) (citing 21 Charles A. Wright et al., Fed, Prac. & Proc. § 5041 (1977) ("The judge cannot grant a directed verdict or judgment notwithstanding the verdict by ignoring evidence he has admitted on the ground that the admission was error.")). "The rationale for prohibiting the district court from disregarding previously admitted evidence [wa]s reliance. If evidence is ruled inadmissible during the course of the trial, the plaintiff has the opportunity to introduce new evidence. However, when that evidence is ruled inadmissible in the context of deciding a motion for [judgment as a matter of law], the plaintiff, having relied on the evidence already introduced, is unable to remedy the situation." *Jackson*, 980 F.2d at 696.

In *Weisgram v. Marley Co.*, 528 U.S. 440 (2000)—a case in which expert testimony was improperly admitted at trial—the Supreme Court abrogated decisions like ours in *Jackson* that had held that all of the evidence presented—properly admitted and improperly admitted—must be considered when ruling on a motion for judgment as a matter of law. The Court in *Weisgram* was unconvinced "that allowing courts of appeals to direct the entry of judgment for defendants will punish plaintiffs who could have shored up their cases by other means had they known their [evidence] would be found inadmissible." *Id*. at 455–56. The Court held that the "authority of courts of appeals to direct the entry of judgment as a matter of law extends to cases in which, on excision of testimony erroneously admitted, there remains insufficient evidence to

support the jury's verdict." *Id.* at 457. *See also id.* at 454 (explaining that "[i]nadmissible evidence contributes nothing to a 'legally sufficient evidentiary basis'").

The Rule 50 question, in light of *Weisgram*, is whether all of the *properly* admitted evidence—viewed in the light most favorable to Taxinet—allowed the jury to award unjust enrichment damages of $300 million. *See Goodman v. Pa. Tpk Comm'n*, 293 F.3d 655, 665 (3d Cir. 2002); *Sardis v. Overhead Door Corp.*, 10 F.4th 268, 279 (4th Cir. 2021); 9B Arthur R. Miller, Fed. Prac. & Proc. Civil § 2540 (3d ed. & June 2024 update); 27A Tracy Bateman et al., Fed. Prac., Lawyer Ed. § 62:750 (June 2024 update). We turn to that question next, starting with the district court's hearsay ruling in the Rule 50(b) order. [6]

---

[6] In support of the district court's order, and as an alternative basis for affirmance, Mr. Leon argues that Taxinet did not present sufficient evidence that it conferred a benefit on him. Viewing the evidence in the light most favorable to Taxinet, we disagree. As Mr. Noboa testified, Taxinet—which had been successful in Guayaquil—contributed its experience, platform, technology, and hardware to the venture with Mr. Leon. Although Mr. Leon had political connections in Mexico City, he had not done anything to develop, run, or support a taxi-hailing app service. The jury could have found that he could not have obtained the September 2015 preliminary approval for the Mexico City concession—which was a critical first step in securing the concession—on his own. *See, e.g.,* D.E. 335 at 145–77. In legal terms, the jury could have found that Taxinet conferred a benefit on Mr. Leon, that Mr. Leon understood and appreciated the benefit, and that Mr. Leon's retention of the benefit without paying for it would be inequitable. Indeed, Mr. Leon offered Mr. Noboa 12.5% of Lusad in October of 2015, and the jury could have found that he did so

## B

We review for abuse of discretion the district court's post-trial ruling that Taxinet's evidence concerning the $2.4 billion valuation by Goldman Sachs constituted inadmissible hearsay. *See City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 556 (11th Cir. 1998). The abuse of discretion standard, which gives a district court a "range of choice" and "considerable leeway," calls for affirmance of an evidentiary ruling unless it constitutes "a clear error of judgment." *United States v. Frazier*, 387 F.3d 1244, 1258–59 (11th Cir. 2004) (en banc).

In a diversity case like this one, Florida law governs on substantive matters like the elements of unjust enrichment, but federal law controls on procedural matters such as the admissibility of evidence. *See, e.g., Fid. & Cas. Co. of N.Y. v. Funel*, 383 F.2d 42, 44 n.3 (5th Cir. 1967); *Peat, Inc. v. Vanguard Rsch., Inc.*, 378 F.3d 1154, 1159 (11th Cir. 2004). So, we look to federal law on the matter of hearsay.

Generally speaking, "an owner [of a business] is competent to give his opinion on the value of his property." *Kestenbaum v. Falstaff Brewing Corp.*, 514 F.2d 690, 698 (5th Cir. 1975) (explaining that the then forthcoming Federal Rules of Evidence would permit testimony by a corporate owner about his business' goodwill). For example, in *Dietz v. Consolidated Oil & Gas Co., Inc.*, 643 F.2d 1088,

---

because of Taxinet's contribution to the venture. *See Agritrade*, 253 So. 3d at 33; *Malamud v. Syprett*, 117 So. 3d 434, 437–38 (Fla. 2d DCA 2013).

1094 (5th Cir. 1981), we held that a farmer could testify "as to the value of [his] growing crops the moment before their destruction." *See also Christopher Phelps & Assocs., LLC v. Galloway*, 492 F.3d 532, 542 (4th Cir. 2007) ("Courts indulge a common-law presumption that a property owner is competent to testify on the value of his own property."); Fed. R. Evid. 701, Adv. Comm. Note ("[M]ost courts have permitted the owner or officer of a business to testify to the value or projected profits of the business, without the necessity of qualifying the witness as an accountant, appraiser, or similar expert.").

But, as with almost all general principles of law, there are limits to this generally accepted principle. Under Rule 701(a) of the Federal Rules of Evidence, lay opinion testimony is "limited" to opinions that (as relevant here) are "rationally based" on the witness' "perception." Though "a lay witness may base opinion testimony on what [he] heard, this does not mean that lay opinion may be based on hearsay. This is because a witness who bases an opinion on hearsay may have perceived the out-of-court statement with the sense of hearing, but the 'matter asserted' by that statement usually relates to facts perceived by the hearsay declarant, not the witness." 29 Victor J. Gold, Fed. Prac. & Proc.—Federal Rules of Evidence: Rule 701 § 6254 (2d ed. & Sept. 2023 supp.). "So if a witness bases lay opinion on the statement of someone else, the application of Rule 701 depends on whether the opinion relies on the mere fact that the statement was made or on the truth of the facts asserted within that statement." *Id.* If it is the latter, the lay opinion is not admissible. *See id.*

The owner of a business may give an opinion on value even if that opinion is partially informed by what others have said or written. *See Dietz*, 643 F.2d at 1094. Whether the "owner's opinion is accurate" is usually "a matter for cross-examination and goes merely to the weight and not to admissibility." *Meredith v. Hardy*, 554 F.2d 764, 765 (5th Cir. 1977).

"What the [business] owner is not allowed to do," however, "is merely repeat another person's valuation." *Cunningham v. Masterwear Corp.*, 569 F.3d 673, 676 (7th Cir. 2009). Admittedly, the line is sometimes difficult to discern, but the owner must have some basis for providing an opinion that is his own; he cannot simply serve as the mouthpiece for otherwise inadmissible hearsay. *See United States v. 68.94 Acres of Land*, 918 F.2d 389, 394 (3d Cir. 1990) ("[T]he rationale which justifies landowners' opinion testimony— i.e., their special knowledge of the property—does not extend to the mere repetition of another's assessment of the property's value."); Lewis Tyree, *The Opinion Rule*, 10 Rutgers L. Rev. 601, 603 (1956) ("Where the 'opinion' is based not on personal knowledge, but on data received from others, again the opinion rule in the legal sense is not involved; the affront is to both the rule of testimonial capacity and the hearsay rule."). In *Kestenbaum*, for example, the business owner based his lay opinion about the value of goodwill on the "long history of the distributorship," additional evidence concerning the goodwill "created during the distributorship's many years of operation," and "documentary evidence of the profits realized during those years." 514 F.2d at 698.

Here, the district court did not abuse its discretion in concluding that it had mistakenly allowed Mr. Leon to testify at trial about the $2.4 billion Goldman Sachs valuation and in excluding that testimony from the sufficiency analysis. What Mr. Leon did, in response to questions by Taxinet's counsel, was repeat the valuation provided by Goldman Sachs in a report that the district court had excluded on hearsay grounds.[7]

The closest Mr. Leon came to giving his own lay opinion was to say that he thought Goldman Sachs took a "conservative approach," but he never explained why he believed that was so, or why he was personally convinced that the valuation was accurate, or why he favored that valuation over LionTree's $450 million valuation. Mr. Leon's "conservative approach" opinion makes the issue a bit closer, but the abuse of discretion standard gives the district court some range of choice. We cannot say that the court

---

[7] On this record, the district court did not err in excluding the Goldman Sachs valuation as hearsay. *See, e.g., LJL 33d Street Assocs., LLC v. Pitcairn Props., Inc.*, 725 F.3d 184, 194 (2d Cir. 2013) ("So far as appears, there was no good reason for Pitcairn to rely on hearsay. It could have presented this [valuation] evidence, unencumbered by the hearsay objection, merely by calling the makers of the exhibits—thus providing LJL with the opportunity to cross-examine these witnesses in an effort to undermine the probative value of the exhibits. Furthermore, expert valuations of this nature are the product of so many complex factors, and so many assumptions . . . as to make it particularly important that the opponent of the valuations be offered the opportunity to test their conclusions by cross-examination."); *In re Cocreham*, No. 13-26465-A-13J, 2013 WL 4510694, at *3 (Bankr. E.D. Cal. Aug. 23, 2013) (concluding that property valuation reports from zillow.com and other internet sources were inadmissible hearsay).

committed a clear error of judgment in ruling that Mr. Leon's valuation testimony was inadmissible hearsay because it merely parroted the conclusion of the Goldman Sachs valuation report. The "primary purpose" of the hearsay rule is the "protection of the right of litigants to confront the witnesses against them and to test their credibility through cross-examination," *Colorificio Italiano Max Meyer, S.P.A. v. S/S Hellenic Wave*, 419 F.2d 223, 224 (5th Cir. 1969), and here Mr. Leon was unable to examine anyone from Goldman Sachs about the valuation.

## C

Once Mr. Leon's testimony about Goldman Sachs' $2.4 billion valuation is excised from the sufficiency of the evidence analysis, the only remaining evidence about that same number comes from Mr. Noboa. As noted earlier, Mr. Noboa testified that Mr. Leon sought $2.4 billion in damages when he sued Mexico City for expropriating the concession. Mr. Leon's demand or complaint in that action, as far as we can tell, was not introduced as an exhibit at trial.[8]

Taxinet argues that Mr. Noboa's testimony about the $2.4 billion figure was admissible under Rule 801(d)(2) of the Federal

---

[8] L1bre, which is wholly owned by Mr. Leon and owns 99.9% of Lusad, initiated arbitration in 2019 against Mexico City—under the auspices of the North American Free Trade Agreement—concerning the allegedly expropriated concession. *See Espíritu Santo Holdings, LP and L1bre Holding, LLC v. United Mexican States*, ICSID Case No. ARB/20/13, https://perma.cc/2SRG-474Q. We can and do take judicial notice of the existence of this arbitral proceeding. *See* Fed. R. Evid. 201(b)(2); *United States v. Jones*, 29 F.3d 1549, 1553 (11th Cir. 1994).

Rules of Evidence because it merely related the statement of Mr. Leon, a party opponent, in his own pleading against Mexico City. *See generally Cont'l Ins. Co. of N.Y. v. Sherman*, 439 F.2d 1294, 1298 (5th Cir. 1971) ("As a general rule the pleading of a party made in another action, as well as pleadings in the same action which have been superseded by amendment, withdrawn or dismissed, are admissible as admissions of the pleading party to the facts alleged therein, assuming of course that the usual tests of relevancy are met."). Although Mr. Leon's arbitration demand or complaint was not introduced as an exhibit, we will assume without deciding that Taxinet is correct on this evidentiary point and that Mr. Noboa's testimony on this point did not constitute hearsay.

Even so, Mr. Noboa's testimony is not legally sufficient to support the jury's $300 million award for a number of reasons. Although Mr. Noboa testified that Mr. Leon was seeking $2.4 billion in damages from Mexico City, there was no explanation as to how that figure was arrived at or calculated. If the $300 million award was based only on Mr. Noboa's testimony, it was speculative. Florida courts have explained that economic damages on an unjust enrichment claim "may not be founded on jury speculation or guesswork and must rest on some reasonable factual basis." *Alvarez*, 258 So. 3d at 512. "Perhaps this need not be done with mathematical certainty," but a quantification "cannot be based upon an unknown, subjective, unexplainable, and therefore unreviewable method." *Id.* at 514. Here there was no connection between the $2.4 billion valuation and the benefit conferred on Mr. Leon by Taxinet in 2015. To borrow language from *Alvarez*, "[e]ven

assuming [that the $2.4 billion in damages sought by Mr. Leon] could be used to establish [his] unjust enrichment, [that figure] could only be used if [Taxinet] provided evidence establishing a fact-based chain of reasoning to allocate or quantify to some degree [its] contribution to those earnings." *Id.* As the district court explained in its Rule 50(b) order, the $2.4 billion valuation "does not represent the value of any benefit conferred on [Mr.] Leon [by Taxinet] in the relevant period." D.E. 302 at 9. *See also F.H. Paschen*, 311 So. 3d at 51 (reversing the grant of summary judgment on unjust enrichment damages because the plaintiff "presented no evidence of the reasonable value of the labor and materials it provided on the [relevant] phase of the project" and "[t]here was no opinion evidence as to the market value of the services performed").[9]

## D

That leaves Mr. Domit's testimony. As a reminder, Mr. Domit, one of the purported partners in the original venture, told the jury that he performed some financial modeling of his own. Depending on assumptions he made and variables he used in the modeling, he came up with a capital cost of between $500,000 and $20 million, and a profit (using the $20 million capital cost figure) of $1.6 billion in five years. He explained that his financial modeling efforts constituted "informed guesswork." D.E. 336 at 106.

---

[9] Neither side has made any arguments about the damages award based on Fla. Stat. § 768.74, so we do not discuss it. *Compare Kerrivan*, 953 F.3d at 1204–08 (analyzing the alleged excessiveness of a compensatory damages award in a claim governed by Florida law under the factors set out in § 768.74).

Mr. Domit, it seems to us, was competent to provide his opinion of what the venture's profit would be in five years' time based on certain assumptions and variables he used in his own modeling. Indeed, there were no objections to his testimony on this point.

We cannot, however, affirm the award of $300 million based on Mr. Domit's testimony. Here's why.

Contrary to Taxinet's argument, Lusad's anticipated profits in 2020 or 2021 based on millions of dollars in projected capital costs are not the measure of unjust enrichment damages for a benefit conferred in 2015 before Lusad began operating the concession. "The measure of damages for unjust enrichment is the value of the benefit conferred, not the amount the plaintiff hoped to receive or the cost to the plaintiff." *F.H. Paschen*, 311 So. 3d at 50. The primary aim of damages in a case like this one "is to restore the plaintiff to his or her initial position before the defendant received the benefit that gave rise to the obligation to restore." 11 Fla. Jur. 2d Contracts § 300 (2d ed. & June 2024 update). *See also Am. Safety Ins. Serv., Inc. v. Griggs*, 959 So. 2d 322, 332 (Fla. 5th DCA 2007) ("Here, even if plaintiffs' contractual agreement with PMI could be construed to confer a direct benefit on American Safety, plaintiffs only presented evidence of the money they hoped to receive under their profit participation agreement with PMI. They presented no evidence of the value of the benefit conferred upon American Safety in the form of the PMI stock or the promissory notes that plaintiffs relinquished.").

"Because unjust enrichment damages are economic damages, the amount . . . must be measurable and quantifiable." *Alvarez*, 258 So. 3d at 512. Taxinet has "offered no competent way to convert" Mr. Domit's $1.6 billion profit figure "to [$300 million] in damages for unjust enrichment." *Id.* at 513.

Taxinet seems to think that Mr. Domit's profit estimate suffices just because the verdict was below that figure, but that is not the way unjust enrichment works. The claim here is not one for breach of contract or breach of a joint venture agreement in which lost profits can sometimes be sought. *See generally* 24 Williston on Contracts § 64:14 (4th ed. & May 2024 update). It is instead one for unjust enrichment, and as a result there must be "some standard or 'yardstick' by which the amount of [unjust enrichment] damages may be adequately determined." *Montage Grp., Ltd.*, 889 So. 2d at 195. That is missing here with respect to Mr. Domit's testimony about anticipated profits. *See Merle Wood & Assocs., Inc. v. Frazer*, 307 So. 3d 773, 776–77 (Fla. 4th DCA 2020) (setting aside a jury award of $184,863.60 in favor of a yacht salesman on his unjust enrichment claim arising from the sale of a yacht: "Frazer himself only testified as to his anticipated profits from the transaction, but offered no testimony computing the value of the benefit conferred.").

Finally, though Mr. Domit's $1.6 billion figure may be a valid starting point for calculating Taxinet's unjust enrichment damages, it cannot on its own support affirmance of the $300 million award. Recall that Mr. Leon offered Messrs. Noboa and Domit

collectively 25% of Lusad.  If Mr. Leon's proposal had been accepted, Mr. Noboa's share would have been 12.5%. And 12.5% of $1.6 billion is $200 million, not $300 million.

## IV

Taxinet requests that we remand for a new trial if we affirm the district court's Rule 50(b) order setting aside the jury verdict. *See* Appellant's Br. at 48–49.  Mr. Leon responds that a new trial would be futile because Taxinet cannot explain what evidence it would introduce to establish the value of any benefit it conferred. *See* Appellee's Br. at 43–44.

When a district court grants a renewed Rule 50(b) motion for judgment as a matter of law, the party against whom the Rule 50(b) judgment is entered may file a Rule 59 motion for a new trial within 28 days of the judgment.  *See* Fed. R. Civ. P. 50(d).  Taxinet did not file a motion for a new trial after the district court granted Mr. Leon's renewed Rule 50(b) motion, and one might think that this failure would preclude it from seeking a new trial on appeal if the Rule 50(b) judgment is affirmed.  But it does not.

Though Taxinet did not move for a new trial below, it may seek a new trial now because of the case's procedural posture.  That is the lesson of *Neely v. Martin K. Eby Construction Company*, 386 U.S. 317, 328 & n.6 (1967): "[I]f the plaintiff's verdict is set aside by the trial court on defendant's motion for judgment n.o.v., plaintiff may bring these very grounds directly to the court of appeals without moving for a new trial in the district court."  Indeed, the party which has had a Rule 50(b) judgment entered against it "can choose

for his own convenience when to make his case for a new trial: he may bring his grounds for new trial to the trial judge's attention when defendant first makes an n.o.v. motion, he may argue this question in his brief to the court of appeals, or he may in suitable situations seek rehearing from the court of appeals after his judgment has been reversed." *Id.* at 328–29. *See also* Rule 50(c)(2), Adv. Comm. Note ("Even if the verdict winner makes no motion for a new trial, he is entitled upon his appeal from the judgment n.o.v. not only to urge that that judgment should be reversed and judgment entered upon the verdict, but that errors were committed during the trial which at the least entitle him to a new trial."); 9B Fed. Prac. & Proc. § 2540 n.7 (discussing *Neely*).

Even when the party who has had a Rule 50(b) judgment entered against it does not specifically request a new trial below or on appeal, we have the discretion to order a new trial—and we have done so, at least once. *See Network Publ'ns, Inc. v. Ellis Graphics Corp.*, 959 F.2d 212, 215 (11th Cir. 1992) ("The appellate court has discretion to order a new trial even though the trial court granted judgment n/o/v to the trial loser."). In *Network Publications*, we ordered a new trial after affirming a Rule 50(b) order granting judgment as a matter of law because liability was not challenged and because there was some (albeit insufficient) evidence of damages. And we did so even though the plaintiff—the verdict winner—had not filed a motion for a new trial below or sought a new trial on appeal: "In this appeal plaintiff insisted that it was entitled to have judgment in its favor reinstated. It did not assert that, if the court did not grant that relief, it was entitled to at least a new trial. The request for a

whole loaf does not preclude this court's discretion to grant the relief of half a loaf." *Id.*

Of course, "not all cases involving insufficiency of evidence deserve a new trial," *Smith v. Washington Sheraton Corp.*, 135 F.3d 779, 785 (D.C. Cir. 1998), but here we conclude in the exercise of our discretion that a new trial on Taxinet's unjust enrichment claim is appropriate. First, as we have explained, Taxinet presented sufficient evidence that it conferred a benefit on Mr. Leon, that Mr. Leon understood and accepted that benefit, and that it would be inequitable for him to retain the benefit without paying for it. Second, though the evidence was insufficient to sustain the $300 million award, Mr. Domit's testimony provided the foundation for awarding Taxinet some damages for Mr. Leon's unjust enrichment. *See Network Publ'ns*, 959 F.2d at 215. This is not a case in which "the defect in the proof is of the sort that could not be expected to be cured by any evidence at a new trial." 9B Fed. Prac. & Proc. § 2538. Third, Taxinet understandably relied on the district court's admission of the testimony of Mr. Leon about the $2.4 billion Goldman Sachs valuation. By the time the district court ruled in its Rule 50(b) order that this testimony constituted inadmissible hearsay, it was too late for Taxinet to remedy the situation by submitting other evidence of damages or presenting a different theory of such damages to the jury. *See Jackson*, 980 F.2d at 696.

Rule 59(a) provides in relevant part that a new trial may be granted "on all or some of the issues." *See* Fed. R. Civ. P. 59(a). Partial new trials are appropriate when "the issue to be retried is so

distinct and separable from the others that a trial of it alone may be had without injustice." *Gasoline Products Co. v. Champion Refin. Co.*, 283 U.S. 494, 500 (1931) (cited as "well settled" authority in *Vidrine v. Kan. City So. Ry. Co.*, 466 F.2d 1217, 1221 (5th Cir. 1972)).

If the issues of liability and damages are "sufficiently interwoven, a partial new trial is inappropriate." 11 Mary Kay Kane, Fed. Prac. & Proc. § 2814 (3d ed. & June 2024 update). That is the case here. Placing a value on the benefit conferred by Taxinet on Mr. Leon is next to impossible without knowing what that benefit was, and that entails understanding the sequence of events that led to the preliminary approval of the concession in September of 2015 and the formal grant of the concession in June of 2016.

The new trial, therefore, will be on the entirety of Taxinet's unjust enrichment claim. Taxinet will bear the burden of establishing all of the elements of unjust enrichment under Florida law, and Mr. Leon will be able to challenge those elements as he sees fit.

## V

Finally, Taxinet appeals the district court's grant of summary judgment on its claims for breach of a joint venture agreement, fraud, fraudulent inducement, conversion, tortious interference, promissory estoppel, and violation of Florida's Deceptive and Unfair Trade Practices Act. It argues that the district court erred in reasoning that all of these claims depended on the existence of an enforceable joint venture agreement and in ruling that Florida's statute of frauds barred enforcement of that agreement. *See* Appellants' Br. at 49–52.

"Our review of a summary judgment order is plenary, and we apply the same legal standards as required of the district court." *Kuhne v. Fla. Dept. of Corr.*, 745 F.3d 1091, 1094 (11th Cir. 2014). Summary judgment was appropriate "if [Mr. Leon] show[ed] that there [were] no genuine dispute[s] as to any material fact[s] and [that he was] entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). We assess all of the evidence and draw all reasonable factual inferences in the light most favorable to Taxinet, the non-moving party. *See Chapman v. A1 Transp.*, 229 F.3d 1012, 1023 (11th Cir. 2000) (en banc).

Florida's statute of frauds provides that "[n]o action shall be brought . . . upon any agreement that is not to be performed within the space of 1 year from the making thereof . . . unless the agreement or promise upon which such action shall be brought . . . shall be in writing and signed by the party to be charged therewith." Fla. Stat. § 725.01. If "full performance is possible within one year from the inception of the contract," the statute of frauds does not apply. *See Browning v. Poirier*, 165 So. 3d 663, 666 (Fla. 2015).

Here, as noted, there was no written agreement. According to Taxinet, however, the members of the joint venture achieved their goal well within a year, even if the concession was only formally granted in June of 2016, when the declaration of need was published. This argument is based on the premise that Messrs. Noboa, Domit, and Leon only intended that the venture, through Lusad, obtain the Mexico City concession. In Taxinet's view, there

was no plan for Lusad to actually continue with and operate the concession.

We disagree. Assuming that there were disputed issues of material fact on whether a joint venture agreement existed, it is undisputed that the desired Mexico City concession was for a period of 10 years, and that it could only be awarded to a Mexican company. That is why Lusad was formed. If Lusad obtained the concession, it would naturally be expected to operate the concession for the 10-year period, or at least for a period of time beyond one year from the formation of the joint venture agreement. Indeed, without operation of the concession Lusad would not realize any profits.

Taxinet seems to recognize this reality in its brief. It says that "[a]s part of the agreement [Messrs. Noboa, Domit, and Leon] formed the Mexican entity Lusad to receive the concession *and operate the concession business, as required by Mexican law*." Appellant's Br. at 50 (emphasis added). This admission is fatal to Taxinet's contention that material issues of fact precluded summary judgment based on the statute of frauds.

Furthermore, the very email that Taxinet cites—sent by Mr. Domit on September 7, 2015—shows that the joint venture was intended to both secure and operate the concession. *See* D.E. 155-16 at 2–3. That email, which referred to "activities" to be completed, included not only the incorporation of a company in Mexico (which turned out to be Lusad), but also the "[h]iring of installation companies," the "[i]nitial staff training," and the creation and

implementation of a "marketing campaign." *Id.* Those "activities" could not be completed within a year of the purported creation of the joint venture agreement, particularly given that the concession was formally awarded only in June of 2016.

As the magistrate judge and the district court correctly explained, the evidence—viewed in the light most favorable to Taxinet—indicates that the joint venture went "beyond obtaining the concession . . . and included the implementation of Taxinet's technology as well as operation of the ride-hailing service for the [10]-year term of the concession." D.E. 192 at 12. The district court properly granted summary judgment to Mr. Leon on Taxinet's other claims.

## VI

Taxinet presented sufficient evidence to allow the jury to find that it conferred a benefit on Mr. Leon, that he accepted the benefit, and that it would be inequitable for him to retain the benefit without paying for it. It did not, however, introduce sufficient admissible evidence to support the jury's award of $300 million on the unjust enrichment claim. The district court therefore properly granted Mr. Leon's Rule 50 motion with respect to damages.

But we exercise our discretion to order a new trial. We do so because there was sufficient evidence of Mr. Leon's receipt and acceptance of a benefit conferred by Taxinet, because Mr. Domit's testimony provided a foundation for an award of some damages to Taxinet, and because Taxinet relied on the district court's admission of the hearsay testimony about the $2.4 billion Goldman Sachs

valuation at trial.  As explained, the trial will be on the entirety of Taxinet's unjust enrichment claim.

We affirm the district court's grant of summary judgment in favor of Mr. Leon on Taxinet's other claims.  The alleged joint venture agreement was that Lusad would obtain and operate the Mexico City 10-year concession.  Because the agreement could not be completed within a year, any claims based on its existence were barred by Florida's statute of frauds.

**AFFIRMED IN PART AND REMANDED FOR A NEW TRIAL.**